[999 NYS2d 713]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v RENE BAILEY, Also Known as RENEE BAILEY, Defendant.

County Court, Monroe County, December 16, 2014

### APPEARANCES OF COUNSEL

*New York Law School Legal Services, Inc.*, New York City (*Adele Bernhard* of counsel), for defendant.

*Sandra J. Doorley, District Attorney*, Rochester (*Matthew Dunham* and *Andra Ackerman* of counsel), for plaintiff.

### OPINION OF THE COURT

JAMES J. PIAMPIANO, J.

The defendant, having been convicted upon a jury verdict of murder in the second degree (Penal Law § 125.25 [4]), moved this court for an order, pursuant to Criminal Procedure Law § 440.10 (1) (g) and (h), vacating the judgment of conviction and sentence or, in the alternative, a hearing on the matter. The defense request was premised, in large part, on the assertion that the defendant was convicted on the basis of uncorroborated evidence that is now widely disputed in the medical community. The defense claimed that new medical and scientific research, relative to the existence and characteristics of shaken baby syndrome, has undermined the reliability of the verdict.

In addition to new medical and scientific evidence, the defense claimed the existence of new exculpatory evidence from a day-care provider about statements made by a child witness, who was interviewed by the police, but did not testify at trial. The defense also asserted an ineffective assistance of counsel claim.

The People opposed the relief sought in the defendant's application, on the grounds that additional medical and expert witness testimony about shaken baby syndrome is not "new evidence" pursuant to CPL 440.10 (1) (g); that the proposed, newly discovered evidence, some of which was available prior to the defendant's trial, is cumulative; and that it is not probable that the admission of such evidence at a subsequent trial would result in an acquittal. The People further asserted that certain evidence which the defense would offer at a subsequent trial constitutes inadmissible hearsay; that the defendant did not act with due diligence in bringing her claims of newly discovered evidence; and that the defendant did not establish the ineffective assistance of counsel.

Upon consideration of the parties' respective submissions and oral arguments, the court granted the defense request for a hearing with respect to, inter alia, the limited issues of whether the proffered expert witness testimony concerning head injuries in children, and whether the proffered testimony concerning Sandra Hennessy's observations of Cameron Burnside's behavior, constitute "new evidence" as that term is contemplated by Criminal Procedure Law § 440.10 (1) (g).

The hearing commenced on April 17, 2014 and spanned three weeks, during which time both parties presented the testimony of numerous witnesses and offered a multitude of exhibits in support of their respective positions. Upon the close of proofs, the court directed each party to submit proposed findings of fact and conclusions of law. The court received written submissions on behalf of the respective parties.

Now, upon consideration of the credible evidence adduced at the hearing of this matter, the court hereby makes the following findings of fact.

### Findings of Fact

### The Defendant's Trial

### December 2001

On the morning of June 6, 2001, 2½-year-old Brittney S. was left in the care of the defendant, who operated a day-care business at her home. Prosecution witnesses testified that Brittney did not exhibit any signs of injury prior to being dropped off at approximately 8:30 a.m. that day. At approximately 3:15 p.m., Brittney's father, David S., received a telephone call from the defendant, who said that Brittney had fallen off of a bench and bumped her head. The defendant further advised Mr. S. that he needed to get to the day care quickly. Mr. S. responded, and found Brittney to be unresponsive. The defendant told him that, while she was in the bathroom, Brittney had fallen from a chair in the playroom.

Brittney's parents took her to the office of her pediatrician, Jack Finnell, M.D. Dr. Finnell called for an ambulance, and Brittney was taken to Strong Memorial Hospital. Although she received treatment in the pediatric intensive care unit, Brittney was pronounced dead the following day.

At the trial, Dr. Finnell testified, as follows:

"Q. Doctor, are you familiar with the term Shaken Baby Syndrome or Shaken Baby Impact Syndrome?

"A. Yes.

"Q. How are you familiar with that?

"A. Throughout medical school, residency, reading about it in journals, experiencing a couple cases of it while in residency, mainly seeing those kids in the Intensive Care Unit after the fact.

"Q. Doctor, based on your training and experience, did the injuries that you suspected that were ultimately borne out at the hospital, were those injuries consistent with a fall from a chair on to a carpeted floor?

"A. No.

"Q. Why not?

"A. Again, I hark back to someone, one of the attendings when I was in medical school as well as reading it in different textbooks and different journals that it is rare and, in fact, never has been seen to have a child fall from less than ten feet or approximately a second story window result in a serious brain injury.

"Q. And, Doctor, based on your training and experience, do you have an opinion as to whether or not the injuries that Brittney suffered were consistent with a shaking or a shaking impact?

"A. I do.

"Q. What is that?

"A. My opinion is based on the fact that there was no external signs of trauma; based on what I know of the Medical Examiner's report that these injuries could not have been suffered any other way than a Shaken Child Syndrome."

At the trial, Frank Maffei, M.D., a pediatric intensive care physician at Strong Memorial Hospital who treated Brittney on June 7, 2001, testified that "I believe this child suffered non-accidental brain injury and I believe the mechanism was from violent shaking." Dr. Maffei based his opinion on a "constellation" of findings that included the consideration of a "history." Dr. Maffei testified that he had noted in his medical chart that, in addition to shaking, *there may have been an impact*. As to the possibility that Brittney's injuries could have been caused by a fall, Dr. Maffei testified that the forces occurring in a fall "usually are not" or are, "rarely, if ever" life threatening.

Upon examination of Brittney's eyes at approximately 7:30 a.m. on June 7, 2001, Dr. Maffei observed diffuse retinal hemorrhages in both eyes, with multiple areas of bleeding. Dr. Maffei further testified that an ophthalmologist later concurred with those findings. On cross-examination, Dr. Maffei testified that impact occurs along with shaking in the majority of cases, and that shaking with impact, generates greater forces than shaking alone. Dr. Maffei acknowledged that he was familiar with a study conducted by Dr. John Plunkett, published in 2001, in which Dr. Plunkett concluded that short falls can be fatal to children.

At the trial, Ana Rubio, M.D., testified on behalf of the prosecution regarding the autopsy that she had conducted on Brittney. Dr. Rubio noted bruises on Brittney's throat and abdomen, and the inside of Brittney's scalp. She "could see only one sign of external trauma in the back of the head on the right side and a little contusion of the cerebellum underneath that area . . . that would be clinically unsignificant [sic]." Dr. Rubio testified that Brittney had suffered a subarachnoid hemorrhage, as well as a subdural hemorrhage in the back and middle of her head. There was a contusion of the back portion of the brain itself, and there was blood in the space between the dura mater and the eye. Further examination revealed retinal hemorrhages in both eyes.

Dr. Rubio testified that Brittney had suffered the kind of massive trauma that one might see as a result of being in a car accident. She described Brittney's injuries as resulting from "Shaken Impact Baby Syndrome" and testified that the acceleration and deceleration forces in shaking a child will be greater if the child's head "is suddenly stopped by impact against a surface." Dr. Rubio explained shaken impact baby syndrome as "a constellation of findings, pathologic findings that they are produced in the setting of a small child being shaken and shaken meaning not only shaking the baby, but maybe shaken plus sudden deceleration when the body is put against a soft object." Dr. Rubio testified that the cause of death in this case was "multiple injuries to the central nervous system produced by rotational forces," and that "the most likely explanation" was that Brittney died as a result of "shaking and impact."

When asked to state the constellation of injuries that she would need to find in order to make a diagnosis involving the shaken impact baby syndrome, Dr. Rubio testified: "In the

medical literature the three findings that are usually present are subdural hemorrhage which is the blood underneath the dura or subarachnoid hemorrhage or both, a [retinal] hemorrhage, and cerebral edema which is swelling of the brain."

Dr. Rubio found all of those injuries in Brittney's case, along with extensive hemorrhage in the nerves around the spinal cord.

Dr. Rubio further testified that, before making a diagnosis of shaken impact baby syndrome, she considered the history regarding the cause of the injuries including, in this case, the allegation that Brittney jumped or fell from a chair that was about 18 inches high. It was Dr. Rubio's opinion that Brittney's injuries were inconsistent with being caused by such a fall. On cross-examination, when Dr. Rubio was asked whether it was possible for Brittney to have sustained the injuries as a result of falling from a chair, Dr. Rubio indicated that it was "extremely unlikely."

The defense called Robert Greendyke, M.D., as an expert witness at the trial. Dr. Greendyke testified that, in preparation for his testimony, he reviewed Dr. Finnell's reports, reports of Brittney's visit to the emergency room, ambulance records, and the Medical Examiner's report. He also examined microscopic tissue sections that were prepared in conjunction with the autopsy by the Medical Examiner's Office, and he reviewed reports pertaining to CT and MRI scans performed on Brittney.

Dr. Greendyke testified that at least some of the blood observed on Brittney's brain during the autopsy was the result of postmortem or perimortem bleeding, and that at least some of the retinal hemorrhaging also occurred post-mortem, or while Brittney was at the hospital. Dr. Greendyke further testified that some of the blood pigment on the brain was caused by a previous fall that Brittney allegedly had sustained in December of 2000, when she was in the defendant's care.

According to Dr. Greendyke's testimony, there was an absence of axonal injuries, which indicated that Brittney's injuries were not the result of shaken baby syndrome. Based upon the bleeding and bruising on the surface of the brain, Dr. Greendyke concluded that Brittney's death resulted from a "violent impact" to her head. He noted that there was "a bruise on the edge of the cerebellum which is a portion of the brain in the back lower central portion of the head," which was "evidence of the head while in motion having struck something," and that Brittney's injuries were consistent with a fall. On

cross-examination, Dr. Greendyke testified that Brittney's injuries could have been the result of her falling from a height of 18 inches onto a carpeted floor, "without question."

## The Post-Conviction Hearing

### April 2014

At the hearing, the defense case commenced with the testimony of Peter Stephens, M.D. Based on the credible evidence adduced at the hearing, the court finds Dr. Stephens to be an expert in the area of pathology. In that regard, the court credits Dr. Stephens' testimony that the recognition of the danger of falling has changed since 2001. Dr. Stephens explained that, over the last 10 years, there has been a progressive change in the attitude toward pediatric head trauma in at least three areas. First, there now is general agreement that short distance falls can cause death. Second, since 2001, retinal hemorrhages have been shown to result from increased pressure inside of the skull, rather than any type of rotational injury. Third, there is a discrepancy in the classical shaken baby theory, with respect to the traditional thinking that shaking disrupted the bridging veins on the surface of the brain.

Based on the credible evidence established at the hearing, the court finds Kenneth Monson, Ph.D., to be an expert in biomechanical engineering with respect to his testimony. In that regard, the court credits Dr. Monson's testimony that the biomedical research and literature has developed significantly since 2001, on the issue of whether shaking, and not short falls, is likely to be the mechanism for the type of injury at issue. That is, shaking a child hard enough to cause brain injury also would cause neck injury, yet none was observed in this case. Further, even falls of just a few feet generate levels of force and velocity that exceed known thresholds for brain injury, which is far more force than an adult human can generate by shaking.

Based on Dr. Monson's knowledge, none of the modeling attempts made since 2001 were able to establish that the violent shaking of an infant or a toddler could cause the kind of subdural hematomas, retinal hemorrhages, brain injury, and death that were associated with this case. Rather, every biomedical investigation that has been performed continues to suggest that the accelerations associated with shaking are lower than what would be expected as necessary to cause those injuries.

Significantly, nothing before 2001 would contradict that finding.

Based on the credible evidence established at the hearing, the court finds John Plunkett, M.D., to be an expert in the area of general and forensic pathology with respect to his testimony. Dr. Plunkett has extensively studied the dangers of short falls to children. A research paper published by Dr. Plunkett in 2001 challenged the then-existing perception that short falls or low velocity impacts could not cause death, by proving that "it was wrong." The study documented cases in which children had died from falls, and it was discussed by expert witnesses at the trial.

The court further credits the testimony of Dr. Plunkett that the triad of subdural hematoma (subdural hemorrhage), retinal hemorrhage, and cerebral edema (swelling of the brain) was viewed as generally pathognomonic (i.e., distinctively characteristic), of shaken baby syndrome prior to the time frame of 2001-2002. Similar testimony was given by several additional defense witnesses: Peter Stephens, M.D., Patrick Lantz, M.D., and Patrick Barnes, M.D.

Dr. Plunkett described Brittney's injuries as including a small volume acute subdural hematoma, malignant rapid brain swelling, contusion at the base of her left temporal lobe, and brain herniation. Dr. Plunkett testified that the combination of the swelling and the herniation caused Brittney's death. Based on the injuries and the history provided, Dr. Plunkett concluded that the bruising on the back of Brittney's head was evidence of an impact injury. He determined that Brittney's head was in motion and struck a solid object, and that her injuries were consistent with the alleged falling or jumping from an 18-inch high chair, and hitting her head on the floor.

Based on the credible evidence established at the hearing, the court finds Michael Baden, M.D., to be an expert in the area of pathology with respect to his testimony. Dr. Baden is a retired pathologist who served as the Chief Medical Examiner of New York City, as well as the Director of the New York State Police Medicolegal Investigations Unit. Dr. Baden testified that he reviewed the autopsy report in this case, photographs of the autopsy and the scene, the ambulance report, hospital records, and trial transcripts.

Referring to the autopsy report, Dr. Baden testified that Brittney's injuries, "were classically due to a fall." Dr. Baden disagreed with Dr. Rubio's conclusion that Brittney's injuries

were consistent with rotational forces and opined that Brittney had a coup/contrecoup injury. Dr. Baden explained that a coup injury only occurs if the moving head strikes something. A contrecoup indicates an impact site on one area of the head and a bruise on the brain 180 degrees opposite thereto. The presence of a coup/contrecoup injury signifies that the head had to be moving at the time that it struck the ground, which is typical of a fall.

In Dr. Baden's opinion, the opinions and conclusions of Dr. Rubio were inconsistent with some of her findings. By way of example, Dr. Baden noted that the cause of death listed in Brittney's autopsy report was multiple brain injuries due to rotational forces (shaken impact baby syndrome) homicide. Rather than multiple brain injuries, however, Dr. Baden noted that there were no brain injuries other than the two that he had previously referenced in the back of the brain and the front side of the brain, which "are classic for a fall and don't support the concept of shaken baby. And there is no subdural hemorrhage, which is part of the importance of the shaken baby that she describes."

The prosecution did not deny that short falls can be fatal. Rather, they countered that fatal falls are so rare as to be inconsequential. Sandeep Narang, M.D., a pediatrician who appeared on behalf of the prosecution, summarized the changes in short fall literature since 2001. He testified that short falls were better defined as five feet or less, and that there has been better biomechanical study of the forces involved in short falls, but the conclusion reached had been the same: that deaths from short falls are possible, but rare.

On cross-examination Dr. Narang testified that, "Yes," the epidemiology literature suggests that short falls can kill, although rarely. The defense asked, "So, again, if the doctors at this trial testified that short falls cannot cause this, that's just wrong, isn't it?" Dr. Narang answered, "If they testified to that, yes, sir." Nevertheless, Dr. Narang conceded that in 1997, leading physicians in pediatrics were stating that the three findings which comprised the triad were virtually unique to shaken baby syndrome.

Barbara Wolf, M.D., a pathologist who appeared on behalf of the prosecution, opined that Brittney's death was caused by an impact to her head, with or without shaking. Furthermore, contrary to Dr. Rubio's trial testimony, Dr. Wolf did not believe that Brittney was shaken and then placed against a soft surface, given that there was a bruise on Brittney's brain.

The credible evidence adduced at the hearing established, however, the falsity of the existing perception at the time of trial, that short falls or low velocity impacts could not cause death. In that regard, Dr. Plunkett's 2001 paper included a number of cases that were either witnessed by non-family members or by a number of adults. One case was documented by a video which showed a low velocity impact that resulted in death. The child in that videotaped fall was 23 months old; she was about the same height, but "a little heavier" than Brittney.

The video depicting the fall was received, under seal, as a court exhibit. The court and the parties' respective attorneys viewed the video at the hearing. In that footage, the 23-month-old girl and her older brother were playing on a plastic gym-type house in the garage of their parents' home. As the girl was straddling one of the rails, holding on with her hand, she lost her grip and fell sideways. The girl's head was about 3½ feet above the ground when she went into a free fall and struck the ground (carpet over a concrete garage floor). The girl first struck with her outstretched hands, and then with the right side of her forehead. She initially was conscious, but 5 or 10 minutes later she had a seizure and was brought into a local hospital. The girl developed a large volume subdural hematoma, which was surgically evacuated, but she subsequently developed malignant cerebral edema and died. The fall occurred in 1993, but Dr. Plunkett did not become aware of it until 2000, when he accidentally came across the incident in the U.S. Consumer Product Safety Commission database. The court credits Dr. Plunkett's testimony that the incident did not appear in the press, or anywhere else that he was aware.

Based on the credible evidence established at the hearing, the court finds Patrick Lantz, M.D., to be an expert in the area of pathology with respect to his testimony. In that regard, the court credits Dr. Lantz's testimony that, at the time of trial, ophthalmologists believed that only the acceleration/deceleration forces generated by violent shaking could cause retinal hemorrhages. Subsequently, similar eye findings were made in relation to crush injuries, falls, and traffic accidents. Dr. Lantz testified that, based upon his review of the medical records and imaging studies in this case, Brittney had retinal hemorrhages that developed while she was in the hospital.

Brian Forbes, M.D., a pediatric ophthalmologist who appeared on behalf of the prosecution, opined that retinal hemorrhages, including those seen in Brittney, are not consistent

with a history from a short distance fall. On cross-examination, Dr. Forbes was asked to compare two writings of the American Academy of Ophthalmology (AAO), one of which was printed from the AAO website and entitled, *Shaken Baby Resources*. The following excerpt from that writing, which dated back to 2003, was read into the record by defense counsel: "When extensive retinal hemorrhage accompanied by perimacular folds and schisis cavities is found in association with intracranial hemorrhage or other evidence of trauma to the brain in an infant, *shaking injury can be diagnosed with confidence regardless of other circumstances*" (emphasis added).

The second writing was entitled, *Information Statement, Abusive Head Trauma / Shaken Baby Syndrome*. The following excerpt from that writing, which was dated June 2010, was read into the record by defense counsel: "When extensive retinal hemorrhage accompanied by perimacular folds and schisis cavities are found in association with intracranial hemorrhage or other evidence of trauma to the brain in an infant *without another clear explanation,* abusive head trauma can be diagnosed with confidence regardless of other circumstances" (emphasis added). Dr. Forbes admitted that the relevant medical community knows far more about retinal hemorrhages in 2014 than it did in 2001-2002.

Daniel Lindberg, M.D., an emergency room physician who was called to testify on behalf of the prosecution, stated his belief that the phrase, "shaken child syndrome" was an unfortunate shorthand which could encompass impact. Dr. Lindberg also testified that retinal hemorrhages can be caused by many different types of trauma, but the severity of Brittney's retinal hemorrhages was inconsistent with a fall from a height of 18 inches. Contrary to Dr. Lindberg's testimony, the court finds the testimony of Julie Mack, M.D. to be persuasive, in that the retinal hemorrhaging seen in Brittney's eyes was consistent with a short distance fall.

Based on the credible evidence established at the hearing, the court finds Julie Mack, M.D., to be an expert in the area of radiology with respect to her testimony. In that regard, Dr. Mack testified that, while the idea that shaking caused bridging vein rupture was widely accepted at the time of the defendant's trial, it now is clear that shaking does not generate enough force to produce a bridging vein rupture. Furthermore, Dr. Mack reviewed Brittney's CT scans and MRI, and concluded that the radiology in this case was inconsistent with a bridging vein rupture.

The court credits Dr. Mack's testimony that the swelling of Brittney's brain developed swiftly, and that it progressed while she was in the hospital. Brittney's first CT scan was performed approximately three hours after she allegedly fell. Shortly after Brittney's second CT scan, which was done around midnight, a monitor was placed into Brittney's brain to check the pressure; the pressure was high enough to significantly limit the amount of blood getting into the brain. That is, the brain was not being perfused even though the heart still was pumping. Given that the blood had to go elsewhere, there was distension in places where blood was not ordinarily seen.

The court credits Dr. Mack's testimony that there was an altered blood flow pattern, which included blood going forward into the eye, including the retinas. The radiology was unequivocal that the hemorrhage progressed, becoming worse in the hospital.

In Brittney's case, there was the unusual occurrence of rapidly developing brain swelling. Blood seen at the autopsy might have represented a natural progression, rather than simply trauma. Dr. Mack summarized: "So, really the summary of the imaging is we have severe, rapidly developing brain edema, progressing to brain death in the course of a day, associated with only a small amount of extra-axial hemorrhage. The contention is an alleged fall injury."

Dr. Mack acknowledged that radiology cannot distinguish between an injury that was accidental, versus an injury that was caused intentionally. Radiology can, however, provide the basis for findings that are consistent, or inconsistent with the provided clinical history. In this case, the radiology was consistent with a small amount of bleeding and a contrecoup injury, such as a short distance fall from a chair.

Based on the credible evidence established at the hearing, the court finds John Galaznik, M.D., to be an expert in the area of pediatrics with respect to his testimony. Dr. Galaznik testified regarding the change in opinion of the American Academy of Pediatrics, regarding head injury in children. At the hearing, Dr. Galaznik was questioned relative to a 2001 article published in Pediatrics, the official journal of the American Academy of Pediatrics, entitled, *Shaken Baby Syndrome: Rotational Injuries—Technical Report*. Consistent with the contents of that article, Dr. Galaznik, as a pediatrician, understood that it was not possible for the constellation of injuries at issue to occur with a short fall.

In 2009, the American Academy of Pediatrics (AAP) published an article entitled, *Abusive Head Trauma in Infants and Children*, in which it was acknowledged that injuries from accidental and abusive causes overlap. Further, the Academy removed the claim that short falls do not cause symptoms like those observed in Brittney. The abstract contained in the 2009 article states, in part:

> "Shaken baby syndrome is a term used often by physicians and the public to describe abusive head trauma inflicted on infants and young children. Although the term is well known and has been used for a number of decades, advances in the understanding of the mechanisms and clinical spectrum of injury associated with abusive head trauma compel us to modify our terminology to keep pace with our understanding of pathologic mechanisms. Although shaking an infant has the potential to cause neurologic injury, blunt impact or a combination of shaking and blunt impact cause injury as well."

In 2010, the American Academy of Pediatrics published a clinical report, entitled, *The Eye Examination in the Evaluation of Child Abuse*, which opened with the statement: "Retinal hemorrhage is an important indicator of possible abusive head trauma, but it is also found in a number of other conditions." The court credits Dr. Galaznik's testimony that said statement represented a significant change from the AAP's 2001 position. That is, in 2001, retinal hemorrhages were presumed to indicate rotational head injury. By 2010, it was recognized that retinal hemorrhages could have multiple causes and be present in many situations. Therefore, retinal hemorrhages are non-specific.

Based on the credible evidence adduced at the hearing, the court finds Patrick Barnes, M.D., to be an expert in the area of pediatric neuroradiology with respect to his testimony. Dr. Barnes reviewed current research and scientific literature regarding child abuse, shaken baby syndrome, and the causes of head and brain injury in children. He outlined the research challenges, such as the circularity of many research designs.

Dr. Barnes stated his opinion, to a reasonable degree of medical certainty, that the findings in this case were more consistent with an impact injury than with a shaking mechanism without impact. Moreover, the findings were consistent with a

fall from an 18-inch high chair, according to the current, best available knowledge and science. The court credits Dr. Barnes' testimony that the current, best available knowledge and science that led him to that conclusion was *not* available in 2001.

John Waldman, M.D., a pediatric neurosurgeon who testified on behalf of the prosecution, also stated that there was no indication of a torn bridging vein in this case. Dr. Waldman explained, however, that a child who dies as a result of a short fall will suffer different injuries than those suffered by Brittney. The most common is an epidural hematoma, which acts as a space occupying lesion. When such an injury is sustained, there is slow bleeding between the dura and the skull, which expands and eventually crushes the brain until it dies. While an epidural hematoma is expanding, the victim may have a lucid interval. Dr. Waldman testified that epidural hematomas have been known to cause death, "as long as people have been falling down." However, without meaningful explanation, Dr. Waldman summarily concluded that Brittney did not suffer an epidural hematoma.

Two other injuries that Dr. Waldman testified might be suffered in a fatal, short fall are a subdural hematoma acting as a space occupying lesion and a carotid dissection. Dr. Plunkett testified that Brittney suffered a small volume acute subdural hematoma, in addition to malignant rapid brain swelling, contusion or bruising at the base of her left temporal lobe (a contrecoup contusion), and brain herniation.

On rebuttal, Dr. Plunkett explained the manner in which the terminology used by doctors has changed since 2002 when they describe injuries to a child's head, believed to be caused by abuse. Dr. Plunkett testified that forensic pathologists generally use the term "blunt head trauma" or "closed head trauma" to describe the results or cause of injury. Pediatricians tend to use the term "abusive head trauma" or "inflicted head trauma." When asked his opinion as to the significance of that change in terminology, Dr. Plunkett testified, as follows:

> "In terms of forensic pathologists, it's an acknowledgment that shaking is an unlikely, if not impossible mechanism for brain injury in an infant. In terms of pediatricians, I can only state what they said in 2008 or 2009, which is that they have changed the name from Shaken Baby Syndrome to Abusive Head Trauma because shaking was too narrow a definition of a mechanism of injury."

## Conclusions of Law

The power to vacate a judgment of conviction upon the ground of newly discovered evidence and concomitantly grant a new trial rests within the discretion of the hearing court (*see People v McFarland*, 108 AD3d 1121 [4th Dept 2013]; *see also People v Tankleff*, 49 AD3d 160, 178 [2d Dept 2007], citing *People v Salemi*, 309 NY 208, 215 [1955], *cert denied* 350 US 950 [1956]). The court must make its final decision based upon the likely cumulative effect of the new evidence had it been presented at trial (*see* CPL 440.10 [1] [g]; *see also People v McFarland*, 108 AD3d 1121 [4th Dept 2013]; *People v Bellamy*, 84 AD3d 1260 [2011], *lv denied* 17 NY3d 813 [2011]).

Criminal Procedure Law § 440.10 (1) (g) states that the judgment may be vacated upon the ground that

> "[n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence."

The new evidence may only be considered if it satisfies all the following criteria: (1) it must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could have not been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be cumulative to the former issue; and (6) it must not be merely impeaching or contradicting the former evidence (CPL 440.10 [1] [g]; *People v Bryant*, 117 AD3d 1586 [4th Dept 2014]; *People v Hamilton*, 115 AD3d 12 [2d Dept 2014], citing *People v Salemi*, 309 NY at 216; *People v Tankleff*, 49 AD3d 160, 178 [2d Dept 2007]). Implicit in the standard, set forth in CPL 440.10 (1) (g), is that the newly discovered evidence must be admissible (36A Carmody-Wait 2d § 205:16).

Pursuant to CPL 440.30 (6), the defendant bears the burden of proving, by a preponderance of the evidence, every fact essential to support the motion. The defendant must overcome a presumption of validity attending the judgment of conviction and has the burden of going forward with allegations sufficient to create an issue of fact (36A Carmody-Wait 2d § 205:85).

As to the probability of a different verdict, it is *not* sufficient that the defendant demonstrate that there is a mere possibility that the jury would return a verdict more favorable to her, if presented with the newly discovered evidence. The proper standard is a probability that the result of the trial would be changed. (*See generally People v Jackson,* 238 AD2d 877 [4th Dept 1997], *lv denied* 90 NY2d 859 [1997].) By way of example, a motion to vacate on the grounds of newly discovered evidence would be denied where there was other, overwhelming evidence of the defendant's guilt (34B NY Jur 2d, Criminal Law: Procedure § 3390).

The court, with those considerations in mind, in conjunction with its findings of fact and the legal arguments of the respective parties, hereby concludes, as follows.

The credible and persuasive evidence presented by the defense established, by a preponderance of the evidence, a significant change in medical science relating to head injuries in children, generally, and the shaken baby syndrome hypothesis, in particular, since the time of the trial in this matter. New research into the biomechanics of head injury reveals that the doctors who testified on behalf of the prosecution at trial misinterpreted the medical evidence to conclude that shaking, or shaking with impact, was the only mechanism capable of causing Brittney's injuries.

The People disputed the notion that the medical community did not accept the possibility that a short fall could be fatal until after January 2002. The court determines, however, that the defense established that the mainstream belief in 2001-2002, espoused by the prosecution's expert witnesses at trial, that children did not die from short falls, has been proven to be false. As more fully set forth in the findings of fact, the court credited the testimony of the defense experts that case studies have demonstrated that children have died from short falls, that biomechanical research has explained the force produced in falls, and that advances in imaging have undercut the theory that shaking causes fatal injury through the tearing of bridging veins. The court further determines that the availability of a text published in 2001 discussing the danger of falls does not undermine the defendant's contention that there has been a sea change in medical belief regarding that danger.

The credible evidence adduced at the hearing also established that doctors view retinal hemorrhages very differently today than they did at the time of trial. Even Dr. Forbes, a prosecu-

tion witness, admitted that the relevant medical community knows more about retinal hemorrhages in 2014 than it did at the time of trial. As more fully set forth in the findings of fact, at the time of trial ophthalmologists believed that only the acceleration, and deceleration forces generated by violent shaking could cause retinal hemorrhages. At the hearing, Dr. Forbes agreed that doctors now know that other events, such as trauma, intracranial pressure, and many other events can cause retinal hemorrhages. Furthermore, Dr. Forbes conceded that the force generated by a single shake is similar to the force that would be caused by a fall.

Likewise, the credible evidence adduced at the hearing established changes in the field of pediatrics regarding head injury in children. In 2001, the American Academy of Pediatrics published an official paper stating that short falls do not cause the constellation of injuries, attributed at trial to shaking. In 2009, the same organization published a new position paper acknowledging that injures from accidental and abusive causes overlap, and removing the claim that short falls do not cause symptoms like those observed in Brittney.

Similarly, in 2001, retinal hemorrhages were presumed to indicate rotational head injury, but by 2010, the American Academy of Pediatrics recognized that retinal hemorrhages can have many different causes.

Changes in the field of pediatric radiology concerning shaken baby syndrome was reflected in the testimony of Dr. Baden and Dr. Barnes, who opined that it is impossible, relying on current medical knowledge and evidence based medicine standards, to conclude that Brittney's injuries were inconsistent with a reported history of a fall from a chair onto a carpeted floor. Contrary to Dr. Rubio's determination at the time of trial that Brittney was shaken, and her rejection of a short fall as an explanation for Brittney's death, Dr. Barnes' opinion was that Brittney's injuries were more consistent with a fall to the floor from an 18-inch high chair than they were with shaking.

Although the prosecution witnesses at the hearing did not deny that short falls could be fatal, they countered that fatal, short falls are so rare as to be inconsequential, and that the injuries sustained by Brittney were not the kind of injuries caused by falls.

The People also challenged the relevance of the defense argument that the "triad" is no longer pathognomonic for abuse, inasmuch as the defense offered no proof that any medical

expert for the prosecution at trial ever mentioned the "triad" or considered it to be dispositive in their diagnostic decision-making. Rather, the People contended that the medical experts at trial testified that they considered the history provided by the defendant, and Brittney's parents. In that regard, the court finds the testimony of Dr. Barnes to be persuasive, such that in 2001-2002, when treating doctors observed the triad of injuries, histories would be rejected unless a caretaker could provide an adequate explanation for the injuries, such as an automobile accident or a fall from two to three stories in height.

The court is mindful of the prosecution's argument that, although the defense experts opined that the manner of Brittney's death was an accidental fall from a chair, those opinions do not constitute newly discovered evidence. Rather, they merely contradict former opinion testimony given at trial by the prosecution's expert witnesses. The People further argued that those differing opinions are not new, because the defendant's medical expert at trial testified that Brittney's injuries were consistent with a fall from a chair.

Nevertheless, the credible evidence adduced at the hearing, which was supported by expert testimony from different disciplines and specialties—pediatrics, radiology, pathology, ophthalmology, and biomechanical engineering—established by a preponderance of the evidence that key medical propositions relied upon by the prosecution at trial were either demonstrably wrong, or are now subject to new debate.

The People argued that, even if the court determined that there is new evidence regarding the lethality of short falls, it is not probable that a jury would acquit the defendant at a new trial based on such evidence. The People posited that the jury would hear that it is exceedingly rare for a child to die from a short fall, and that the types of injuries a child suffers in a fatal short fall are different from the injuries Brittney suffered. Further, the jury would be left to examine that evidence in light of the defendant's arguably inconsistent version of events and the People's expert witnesses, who concluded that Brittney's injuries were inflicted, rather than caused by a fall.

The court concludes, however, that in light of current information available to the medical and other scientific communities, it is unlikely that the prosecution's experts at a new trial would testify as adamantly, if at all, as they did in 2001, that Brittney's injuries were the type caused by shaking, and that they were not the type caused by a short fall (*see generally*

*Cavazos v Smith*, 565 US —, —, 132 S Ct 2, 10-11 [2011, Ginsburg, J., dissenting]). The credible evidence adduced at the hearing established that recent medical and scientific opinion significantly, and substantially, undermines that 2001 trial testimony.

The newly discovered evidence in this case thus shows that there has been a compelling and consequential shift in mainstream medical opinion since the time of the defendant's trial as to the causes of the types of trauma that Brittney exhibited. Moreover, the defense presented evidence that was not discovered until after the entry of judgment, in the form of expert medical testimony, that a significant and legitimate debate in the medical community has developed in the past 13 years, over whether young children can be fatally injured by means of shaking, particularly in consideration of the injuries suffered by Brittney at her age. Thus, the court concludes that the evidence is of such character as to create a probability that it would change the result if a new trial was granted. (*See generally State v Edmunds*, 308 Wis 2d 374, 746 NW2d 590 [2008].)

The court notes that the due diligence requirement is measured against the defendant's available resources and the practicalities of the particular situation (*People v Bryant*, 117 AD3d 1586 [4th Dept 2014]). Accordingly, the court concludes that the defendant could not have produced such evidence at trial, even with due diligence, as the credible evidence adduced at the hearing demonstrated that the bulk of the medical research and literature supporting the defense position, and the emergence of the defense position in the medical community, only emerged in the 13 years following her trial (*see generally State v Edmunds*, 308 Wis 2d 374, 746 NW2d 590 [2008]).

Further, the court determines that the new medical testimony presents an alternate theory for the source of Brittney's injuries, and such evidence differs in substance and quality from the defense evidence at trial. The new evidence is material to the issue, and it is not cumulative, merely impeaching, or contradicting of the former evidence.

The court thus concludes that the proffered expert witness testimony, concerning head injuries in children, does constitute "new evidence" as that term is contemplated by CPL 440.10 (1) (g). The defendant's alternative request to amend the motion to add a claim pursuant to CPL 440.10 (1) (c), and to reinstate

her claim pursuant to CPL 440.10 (1) (h), is therefore rendered moot.

In light of the foregoing, the court need not address whether the proffered testimony, concerning Sandra Hennessy's observations of Cameron Burnside's behavior, constitutes "new evidence" as that term is contemplated by Criminal Procedure Law § 440.10 (1) (g) or, whether it should be considered in support of this motion. The defense argued that, unbeknownst to the parties at the time of trial, for at least two years after leaving the defendant's care, young Cameron was seen by Ms. Hennessy, his subsequent day-care provider, to engage in a specific role playing game a couple of times per week. Cameron would speak to an imaginary friend named, "Brittney," whom he told to jump and encouraged her to "do it." Cameron then would use a particular stuffed animal to comfort his imaginary friend. Nevertheless, upon consideration of all of the testimony offered at the hearing from Sandra Hennessy, the court finds that such testimony was credible, and compelling, but this court is not considering that testimony upon reaching its decision in this matter.

Accordingly, it is hereby, ordered, adjudged and decreed, that the defendant's motion for an order, pursuant to Criminal Procedure Law § 440.10 (1) (g), vacating the judgment of conviction and sentence in this matter, is hereby granted; and it is hereby ordered, adjudged and decreed, that the defendant is hereby granted a new trial, on the charge set forth in the above-referenced indictment, on a date to be determined by the court; and it is hereby ordered, adjudged and decreed, that the defendant be brought back before the court, forthwith, to schedule a new trial.