# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Matter of the Personal Restraint Petition of | No. 46310-5-II |
| HEIDI CHARLENE FERO, | PUBLISHED OPINION |
| Petitioner. | |

LEE, J. — Heidi Charlene Fero was convicted of first degree assault of a child in 2003 for the injuries suffered by Brynn Ackley. The evidence that linked Fero to Brynn's injuries was that (1) Brynn had fallen unconscious while under Fero's care and had presented at the hospital with subdural hemorrhaging (brain bruising or bleeding), cerebral edema (brain swelling), and retinal hemorrhaging (retina bruising or bleeding); and (2) all of the doctors who testified on the topic stated that children suffering those injuries become unconscious almost immediately and those injuries can only be caused by car accidents, long falls, or abuse by an adult. Fero now brings this personal restraint petition (PRP) asserting new material facts exist in the form of the now generally accepted medical paradigm that recognizes children can remain lucid for up to three days after suffering similar head injuries and those injuries are now known to be caused by much less extreme circumstances.

We agree that Fero has presented sufficient new material facts to warrant relief because the uncontested declarations of the medical experts she provided establish that the result of her trial

would probably be different if the current generally accepted medical evidence was available at the time of her trial in 2003. Accordingly, we grant Fero's petition and remand for a new trial.

FACTS

A.    THE INJURIES

On January 7, 2002, Heidi Fero baby-sat two children—15-month-old Brynn Ackley[1] and 4½-year-old Kaed Frank—at Fero's home in Clark County. Fero's two children—1-year-old Deric and 5-year-old Rachel—were also at Fero's home. Fero had baby-sat Brynn and Kaed on multiple occasions before that day.

Brynn and Kaed were dropped off at about 2:00 p.m. that day, and left in the care of Fero's boyfriend, Dustin Goodwin. Goodwin testified that Brynn's mother carried Brynn into the house in her car seat, which was the only occasion she had done so. Usually, Brynn's mother would bring Brynn and Kaed in, and then go back out for the car seat and diaper bag. Brynn was upset, so Goodwin placed her in a rocking chair to calm her down. When Deric put his hands on her legs she began crying again and needed Goodwin to calm her down.

Fero came home from work at about 3:00 p.m., and Goodwin left for work shortly thereafter. Fero described Brynn as being "distant" and staying wherever Fero set her, instead of following Fero around like she usually did. 5A Verbatim Report of Proceedings (VRP) (Mar. 17, 2003) at 75. Fero saw several bruises on Brynn's body when Fero gave her a bath after dinner. Brynn had been acting tired so, after the bath, Fero put Brynn to bed in a playpen downstairs while she bathed Deric.

_____

[1] Both parties refer to the children by their first names in the briefing; this opinion follows the parties' lead.

2

While Fero was bathing Deric, Rachel came upstairs to tell Fero that Kaed was hurting Brynn. Fero took Deric out of the bath, put him in his crib, and went downstairs. When Fero got downstairs, Kaed was on the couch. Fero covered Brynn back up before heading upstairs again to finish drying Deric off. As Fero was drying Deric off and putting him to bed, Rachel came upstairs again to tell Fero that Kaed was "banging Bryn's [sic] head into the wall." 5A VRP (Mar. 17, 2003) at 81. Fero went back downstairs and testified that she "saw Cade [sic] climbing out of the [playpen], trying to get out of there fast," and "back over to the couch." 5A VRP (Mar. 17, 2003) at 82.

Fero went to the playpen and saw Brynn on her hands and knees, "shaking" and "trembling," with a little blood in her mouth. 5A VRP (Mar. 17, 2003) at 82. Fero picked Brynn up to comfort her. When she thought Brynn had fallen asleep, Fero laid Brynn on a futon that was angled inward so Brynn could not roll off.

Fero then called Brynn and Kaed's father, Jason Ackley, to tell him she was concerned that Kaed had been hurting Brynn by "pushing Brynn's head into a wall" and that Brynn could not walk on one leg. 1 VRP (Mar. 11, 2003) at 119. According to Ackley, Fero wanted to know how to discipline Kaed. Ackley said he told Fero to put Kaed in a different room.

Brynn continued to lay on the futon while Fero cleaned the house and the other kids watched a movie. Fero periodically checked on the kids during this time. At some point, Fero noticed that Brynn's eyes were halfway open—she did not look like she was sleeping, nor did she look like she was awake.

Fero placed her hand on Brynn's chest and Brynn was breathing, but Brynn would not respond when Fero called Brynn's name or wiggled her chest. Fero took Brynn to the kitchen and

3

tried putting water on Brynn's face to get a response. Fero called her mother at 9:52 p.m. and called 911 at 9:54 p.m.

When the paramedics arrived at 9:59 PM., Brynn was "completely unconscious." VRP (Mar. 10, 2003) at 39. According to the paramedics, Brynn's color was good, except for some "bruising to her forehead, around her nose, and on her chin." VRP (Mar. 10, 2003) at 40-41. The paramedics transported Brynn to the hospital.

Brynn was transported to Southwest Washington Medical Center. There, Dr. Daniel Gorecki performed a CAT (computerized tomography) scan of Brynn's head, chest, and abdominal/pelvic area. The CAT scan of Brynn's head showed a subdural hematoma, which is a blood clot on the brain, and a cerebral edema, which is a swelling of the brain. Brynn was then transferred to Legacy Emanuel Hospital where she was placed in the pediatric intensive care unit.

The following morning, Brynn was seen by Dr. Shawn Goodman, a pediatric ophthalmologist at Legacy Emanuel. Dr. Goodman noted that Brynn had retinal hemorrhages in both eyes. Brynn was also seen that day by Dr. Mike Lukschu at Legacy Emanuel, who noted Brynn had a fractured left shinbone.

The State charged Fero with one count of first degree child assault.

B.    NON-MEDICAL TESTIMONY PRESENTED AT TRIAL

The State presented several witnesses whose testimonies refuted portions of Fero's account of what happened. These witnesses included Detective Scott Smith, Officer Scott Telford, and Detective Steve Norton, all with the Vancouver Police Department.

Detective Smith testified that he was directed to investigate around the playpen because that was where he was told Brynn's injury had occurred. He testified that the absence of

indentations left by the playpen indicated that the playpen had not been up against the wall, but was close to the wall. He also testified that Fero had told him Brynn had had a bloody lip in the playpen, but he did not see any blood around the playpen. Detective Norton testified that Fero told him that she wiped the blood off of Brynn's mouth with a handy wipe.

Officer Telford testified that Fero had told him on the night Brynn was injured that she had laid Brynn down on the futon and "within about five minutes she said she checked on Brynn and found . . . that [Brynn's] eyes were glazed over and that [Brynn] was unresponsive." 1 VRP (March 11, 2003) at 88. Detective Norton also testified that the time frame Fero relayed to him was that "from the time she got Brynn out of the crib and put her on the couch until she noticed that something was wrong with her was about five minutes." 2 VRP (March 12, 2003) at 192. This conflicted with Fero's statements that she had checked on Brynn periodically while cleaning the house.

C.    MEDICAL TESTIMONY PRESENTED AT TRIAL

The State presented six doctors during the trial who testified on the nature and cause of Brynn's injuries.[2] Those doctors were Dr. Daniel Gorecki, Dr. Shawn Goodman, Dr. Mike Lukschu, Dr. James Ockner, Dr. William Bennett, and Dr. Kent Grewe.

Dr. Gorecki, the emergency room doctor at Southwest, testified that "the subdural [hematoma] is caused by the shaking, essentially, of the brain within the cranium." 1 VRP (Mar. 12, 2003) at 60. He testified further that he did not believe that a four-and-a-half-year-old boy,

---

[2] Dr. Janice Cockrell also testified. Dr. Cockrell was a pediatrician who assumed the care of Brynn when she became more responsive and was moved to the rehabilitation unit of Legacy Emanuel. Her testimony only related to Brynn's motor skills and cognitive function at the time of trial and in the future.

meaning Kaed, could inflict the trauma that Brynn sustained. Dr. Gorecki said he based this opinion on working with kids and keeping up on the literature. Finally, Dr. Gorecki testified that it could take five or ten minutes, or up to as much as two hours, for a child who suffered this kind of trauma to lose consciousness while the swelling in the brain progresses.

Dr. Goodman, the pediatric ophthalmologist at Legacy Emanuel, testified that the retinal hemorrhages in Brynn's eyes were "consistent with nonaccidental trauma." VRP (Mar. 13, 2003) at 63. Dr. Goodman testified that retinal hemorrhages could occur if the patient had been in a car accident or had fallen from several stories, but they were found "most commonly in nonaccidental trauma." VRP (Mar. 13, 2003) at 63.

Dr. Lukschu, the pediatrician at Legacy Emanuel, testified that head injuries like Brynn's were "the result of severe shaking," and he based that opinion on the CAT scans and the presence of retinal hemorrhages. 2 VRP (Mar. 11, 2003) at 191. He testified that subdural hematomas occur "during severe shaking [when] the brain jostles around" in the skull, causing the veins that connect the surface of the brain to the skull through the dural layer to break, and resulting in blood collecting under the dural membrane. 2 VRP (Mar. 11, 2003) at 192. He said the only debate in the medical community was whether injuries like Brynn's required a shaking and impact and most of the medical community believed shaking alone was sufficient. As to Brynn's retinal hemorrhages, Dr. Lukschu testified that he believed shaken baby syndrome was the only way to cause the retinal hemorrhages that extend all the way to the retina. He further testified that this type of injury could not have happened from falling off of a counter or a bed. Finally, he testified that "[w]ith this severe injury . . . . She would have been almost immediately unconscious." 2 VRP (Mar. 11, 2003) at 195.

Dr. Ockner, a radiologist at Southwest, reviewed Brynn's CAT scans when she was at Southwest. He testified that a subdural hematoma occurs when the brain is shaken severely or is slammed into something, like in a car wreck, a severe blow to the head, or a fall from a great height; and that it could not occur from falling off a counter top or out of bed. He opined that "something had been inflicted on this patient not by accident" because there was no visible external injury that was indicative of such injury and there was bleeding along the membrane that was indicative of rotational forces. 1 VRP (Mar. 12, 2003) at 92. Finally, Dr. Ockner testified that with this type of "shaking injury, typically a patient loses consciousness right away." 1 VRP (Mar. 12, 2003) at 97.

Dr. Bennett, a pediatric radiologist at Legacy Emanuel, reviewed some of the x-rays and CAT scans from Brynn's file and testified about Brynn's broken leg and head injuries. He testified that the type of force required to produce a head injury like Brynn's would be the "equivalent of being ejected from a motor vehicle and smashing her face into a bank." VRP (Mar. 13, 2003) at 30.

Dr. Grewe, a neurosurgeon at Legacy Emanuel, examined Brynn on the night she arrived at Legacy Emanuel. He also performed the brain surgery on her that night to remove the blood clot and relieved the swelling in her brain. Dr. Grewe testified that there would "[p]robably not" be "any lucid interval between the time she sustained the injury and the onset of the [brain] swelling," "and the swelling usually starts immediately." VRP (Mar. 13, 2003) at 43.

D.    PROCEDURAL HISTORY

Fero was found guilty of first degree assault of a child on March 18, 2003. 6 VRP (Mar. 18, 2003) at 212. She appealed, challenging the sufficiency of the evidence, the constitutionality

7

of the jury instructions, and the application of an exceptional sentence. *State v. Fero*, 125 Wn. App. 84, 87, 104 P.3d 49 (2005). We affirmed the conviction and, on remand from the State Supreme Court, amended our opinion to require Fero be resentenced within the standard range. *Fero*, 125 Wn. App. at 102. The direct appeal mandated in 2006.

On May 6, 2014, Fero filed this personal restraint petition while she was incarcerated. Fero was released from prison on July 30, 2014, but remains under post-release restrictions.

E.     MEDICAL TESTIMONY PRESENTED IN SUPPORT OF THIS PRP[3]

In support of her PRP, Fero submits the declarations of two doctors specializing in the field of pediatric head trauma: Dr. Patrick Barnes and Dr. Janice Ophoven. Fero asserts that in their declarations, Dr. Barnes and Dr. Ophoven both establish that there has been a paradigm shift in the medical community's understanding of head trauma in children and that Dr. Barnes and Dr. Ophoven both conclude that it was impossible to determine that Brynn's injuries occurred in Fero's care.

1.     Declaration of Dr. Barnes

Dr. Barnes is a pediatric neuroradiologist, Chief of Pediatric Neuroradiology at Lucile Salter Packard Children's Hospital, and Professor of Radiology at Stanford Medical Center. He has "practiced and taught on head injury in children for thirty five years, and ha[s] published over one hundred articles, reviews, and book chapters on this subject." Decl. of Barnes at 1-2.

---

[3] Fero also submits several exhibits attesting to her positive influence on others while in prison. These are irrelevant to her petition to this court because they are not material to the conviction. RAP 16.4(c)(3).

Dr. Barnes states in his declaration that since Fero's trial, the understanding of the radiological findings that had been "associated with non-accidental pediatric head trauma have greatly expanded and now include a variety of accidental and natural causes." Decl. of Barnes at 3. Moreover, contrary to what was previously understood, the research since Fero's trial has established that children who suffer trauma, non-accidental or accidental, can remain lucid for three days or more after the trauma is inflicted.

In support, Dr. Barnes cites articles and associated studies from 1987 to 2012, and states, "Over the past decade, many doctors—including myself—have changed their testimony and beliefs to bring them into accord with the scientific evidence and standards of evidence-based medicine." Decl. of Barnes at 5-6. He continues:

> Given the new medical research on lucid intervals, the testimony of the State's experts to the effect that Brynn would have immediately gone unconscious is unsupported by the medical literature. It is impossible to tell from the radiology or otherwise in the medical record when Brynn was injured, and there is a significant chance that she was injured before she arrived at Ms. Fero's home.

Decl. of Barnes at 26-27. Dr. Barnes concludes that "[a]t the time of Ms. Fero's trial, many doctors would have agreed with the doctors for the state. . . . However, shaken baby syndrome theories as applied in this case are no longer supported by the scientific literature." Decl. of Barnes at 31.

2.      Declaration of Dr. Ophoven

Dr. Ophoven offers a similar opinion and conclusion. Dr. Ophoven is a pediatric forensic pathologist, specializing in "'shaken baby syndrome' and 'abusive head trauma' cases in which violent shaking is alleged to be the cause of serious injury or death of a child." Decl. of Ophoven at 1. She has been in the field for nearly 40 years and currently works as an independent consultant primarily on cases involving allegations of child abuse or neglect. Decl. of Ophoven at 1.

9

Dr. Ophoven states in her declaration that the nonaccidental or accidental nature of Brynn's injuries cannot be determined by the medical evidence in Brynn's case. Nor can the timing of Brynn's injuries be determined exactly, but it is more likely that she suffered the injuries 12 to 24 hours before arriving at the hospital.

Dr. Ophoven also states that in 2003, "many medical professionals believed that if a child presented with a triad of symptoms, including cerebral edema, subdural hematoma and retinal hemorrhages, that was exclusively diagnostic of abuse by violently shaken" and that symptoms of the brain injuries would manifest immediately. Decl. of Ophoven at 5. These views, she says, were supported by 2001 papers issued by the American Academy of Pediatrics (AAP) and the National Association of Medical Examiners.

Dr. Ophoven explains that since 2003, it has become generally accepted in the medical community that falls from chairs and similar heights can cause the same subdural hematoma, cerebral edema, and retinal hemorrhages in children. There have been documented examples of children falling from 30 inches and suffering significantly worse injuries than Brynn's. The AAP issued a new paper in 2009 acknowledging the advances in the medical understanding of child head trauma.

Dr. Ophoven concludes,

Based on the medical records, my review of the literature, and my experience as a pediatric forensic pathologist . . . it is my opinion that much of the medical testimony presented during Ms. Fero's 2003 trial is no longer scientifically valid in light of recent advances in the medical community's understanding of the natural, accidental and non-accidental causes of cerebral edema, subdural hematoma and retinal hemorrhages.

Decl. of Ophoven at 3. Further, Dr. Ophoven states that "[b]ased on the new medical evidence regarding lucid intervals and the mechanism and timing of the development of cerebral edema, I have concluded, to a reasonable degree of certainty, that Brynn was injured at least 12 hours before her first CT scan, which would have been before Brynn was dropped off at Heidi Fero's house." Decl. of Ophoven at 10.

## ANALYSIS

Fero petitions for release from her continuing post-conviction restraints. She argues that the paradigm shift in the medical community's understanding of "shaken baby syndrome" and head trauma in children, as described in the declarations of Dr. Barnes and Dr. Ophoven attached to her petition, constitute new "material facts" satisfying the standard for her release under RAP 16.4(c)(3). We agree and grant her petition.

A. STANDARD OF REVIEW

The collateral relief afforded under a personal restraint petition is limited and requires the petitioner to show that she was prejudiced. *In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 596, 316 P.3d 1007 (2014). There is no presumption of prejudice on collateral review. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 823, 650 P.2d 1103 (1982). The petitioner must either make a prima facie showing of a constitutional error that, more likely than not, constitutes actual and substantial prejudice, or a nonconstitutional error that inherently constitutes a complete miscarriage of justice. *In re Pers. Restraint of Stockwell*, 161 Wn. App. 329, 334, 254 P.3d 899 (2011), *aff'd*, 179 Wn.2d 588, 316 P.3d 1007 (2014); *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810, 812, 792 P.2d 506 (1990). Without either such showing, this court must dismiss the

petition. *Cook*, 114 Wn.2d at 810, 812; *see also In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983).

The petitioner must support her allegations of prejudice with specific evidence. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). Such support may come in a variety of evidentiary forms, but it must be competent and admissible and establish a factual basis for the allegations. *Id.* Bald assertions and conclusory allegations are not sufficient. *Id.*

B.     TIMELINESS AND MERITS OF PETITION

Typically, personal restraint petitions must be brought within one year after the judgment becomes final. RCW 10.73.090(1). However, the one year time bar does not apply to a petition based on "[n]ewly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition." RCW 10.73.100(1).

Under RAP 16.4, this court will grant relief to a petitioner if the petitioner's restraint is unlawful because, among other reasons, "Material facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction, sentence, or other order entered in a criminal proceeding." RAP 16.4(c)(3). The standard for relief under RAP 16.4(c)(3) "is the same as that applied to a motion for new trial based upon newly discovered evidence." *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001).

Accordingly, for Fero's case to be timely because there is "newly discovered evidence," and for Fero's petition to warrant relief under the RAP 16.4(c)(3) exception, she must establish

> "that the evidence (1) will probably change the result of the trial; (2) was discovered
> since the trial; (3) could not have been discovered before trial by the exercise of
> due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching. The

absence of any one of the five factors is grounds for the denial of a new" proceeding.

*In re Brown*, 143 Wn.2d at 453 (quoting *State v. Williams*, 96 Wn.2d 215, 222–23, 634 P.2d 868 (1981) (citations omitted)).

1.     Factor 1: Probably Change the Result of the Trial

Fero argues that the result of her trial would probably be different because the medical community's now generally accepted understanding of brain trauma in children directly contradicts the medical theories that were relied upon to convict her, and she could not have been convicted without the now-refuted medical testimony presented against her. We agree.

Fero specifically points to the testimony of the several doctors who testified that a child would lose consciousness "almost immediately" after the injury, and contrasts that with declarations of Dr. Barnes and Dr. Ophoven stating that it is now known that children can remain lucid for up to three days after suffering the injury. Fero also points to the testimony of the several doctors who testified that the only causes of Brynn's injuries could have been (1) a major accidental trauma or (2) child abuse, and contrasts that with the declarations of Dr. Barnes and Dr. Ophoven explaining that today there are many acknowledged causes of the injuries Brynn suffered and that using the medical science available today, it is impossible to determine what caused Brynn's injuries.

At Fero's trial, the State argued that Brynn's injuries happened while she was in Fero's care on January 7 and that the injuries were recklessly caused by Fero. Because no one testified to witnessing Fero inflicting such injuries on Brynn and the only people who were at the house at

the time were children who did not testify that Fero hurt Brynn,[4] the State had to prove that it was Fero who inflicted Brynn's injuries through the medical evidence and inferences drawn from that evidence.

           a. Lucidity after Suffering the Injuries

To establish Brynn was injured by Fero, the State first showed that Brynn must have lost consciousness while she was with Fero. The State relied on statements by Fero and others that she had found Brynn unconscious sometime between when she called Jason Ackley at about 7:45 p.m. and when she called 911 at 9:54 p.m. The State then compared that time frame with repeated medical testimony from multiple doctors that Brynn's injuries were such that she would likely have lost consciousness "almost immediately," but surely not more than two hours, after suffering the injuries. *See, e.g.*, 2 VRP (Mar. 11, 2003) at 195 (Dr. Lukschu testifying, "She would have been almost immediately unconscious."); 1 VRP (Mar. 12, 2003) at 97 (Dr. Ockner testifying that with this type of "shaking injury, typically a patient loses consciousness right away."); VRP (Mar. 13, 2003) at 43 (Dr. Grewe testifying that there would "[p]robably not" be "any lucid interval between the time she sustained the injury and the onset of the [brain] swelling . . . and the swelling usually starts immediately"; VRP 1 (Mar. 12, 2003) at 70, 74 (Dr. Gorecki testifying that it could take five or ten minutes, or up to as much as two hours, for a child who suffered the same kind of trauma to lose consciousness). The conclusion that the State was able to explain to the jury was that Brynn's injuries had to have been sustained when she was with Fero because she had been

---

[4] *See* VRP 2 (Mar. 12, 2003) at 214-15 (Officer Norton testifying that Kaed told him he did not see anyone hurt Brynn on the day she was hurt); *see also* 5A VRP (Mar. 17, 2003) at 39-59 (Rachel testifying about the events that night and repeatedly saying it was only Kaed who hurt Brynn).

14

conscious when she was with everyone else that day and the medical testimony established that she could not have remained conscious for any substantive amount of time after suffering the injuries.

b. Cause of the Injuries

With the medical testimony establishing that the injuries must have occurred while Brynn was in Fero's care, the State next had to show that Brynn's injuries were inflicted by Fero. The State was able to make this showing through the several doctors who testified at Fero's trial that the type of injuries Brynn suffered could only be inflicted through some type of major trauma, like (1) being thrown from a car in an auto accident or falling from several stories up or (2) from child abuse inflicted by an adult. *See, e.g.*, 1 VRP (Mar. 12, 2003) at 60, 63-64 (Dr. Gorecki testifying that Brynn's injuries were caused by shaking, and that it was not conceivable for a 4½-year-old boy to inflict the trauma that Brynn sustained); VRP (Mar. 13, 2003) at 30 (Dr. Bennett testifying that Brynn's injuries required a force "equivalent to being ejected from a motor vehicle and smashing her face into a bank."); 1 VRP (Mar. 12, 2003) at 84, 92, 96-97 (Dr. Ockner testifying that Brynn's injuries were not inflicted by accident because there was no external injury and her injuries would have been caused by an auto accident, a severe blow to the head, or a fall from a great height); VRP (March 13, 2003) at 63 (Dr. Goodman testifying that Brynn's injuries could occur if the patient had been in a car accident or had fallen from several stories, but that they were "most commonly in nonaccidental trauma"); 2 VRP (March 11, 2003) at 191 (Dr. Lukschu testifying that Brynn's injuries were most likely "the result of severe shaking"). Because there were no allegations that Brynn had been in a car accident or fallen from a building, the State was

able to show that the only medically possible explanation for the type of injuries Brynn suffered was child abuse at the hands of Fero.

### c. The Medical Community's Current Paradigm

Both Dr. Barnes and Dr. Ophoven submit in their declarations that the medical community's generally accepted understanding of the duration of a child's lucidity after a traumatic head injury and the potential causes for serious head trauma in children, have changed dramatically since Fero's trial in 2003. The testimony in the declarations of Dr. Barnes and Dr. Ophoven refutes the medical testimony that was presented by the medical experts during Fero's trial, but also acknowledges that the medical testimony presented at trial was consistent with the generally accepted medical understanding at that time.

Dr. Barnes and Dr. Ophoven declare that, contrary to what was previously believed, today the medical community recognizes that children can stay lucid for multiple days after suffering a traumatic head injury. *See* Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 WASH. U. L. REV. 1 (2009). Their assertions are not contested by the State and directly contradict the medical testimony that Brynn's injuries had to have happened at Fero's house because that is where Brynn lost consciousness.

Dr. Barnes and Dr. Ophoven also declare that the medical community now recognizes that trauma like Brynn's, which was once believed could only be inflicted by car accidents, long falls, or child abuse, can actually be caused by short falls and other low-impact accidents, in addition to various natural causes. In fact, as Dr. Ophoven points out, under the current paradigm, a child is "more than capable" of causing severe head trauma to another child. Decl. of Ophoven at 4.

Dr. Barnes and Dr. Ophoven further declare that the medical community now generally accepts that there are multiple conditions that "mimic" the symptoms of what used to be classified as "shaken baby syndrome." Decl. of Barnes at 17; Decl. of Ophoven at 7; Tuerkheimer, *supra*. Thus, under the current medical understanding of the trauma Brynn suffered, and based on the record available at Fero's trial, Dr. Barnes and Dr. Ophoven state that it is impossible to determine that Brynn suffered the injuries at Fero's house and impossible to determine that her injuries were recklessly inflicted. This testimony contradicts the certainty of the doctors at trial that Brynn's injuries had to have been inflicted by Fero.

d. Legal Precedent

Whether the current medical paradigm described by Dr. Barnes and Dr. Ophoven creates a reasonable probability of a different result at trial is an issue of first impression in Washington. Other jurisdictions that have considered the current paradigm's effect on prior convictions have granted relief to the petitioner.

*State v. Edmunds*, 308 Wis. 2d 374, 746 N.W.2d 590 (Wis. Ct. App. 2008), presents facts similar to those in this case. In *Edmunds*, a woman was convicted of first degree reckless homicide for allegedly shaking a seven-month-old child. *Id.* at 378. At her trial, the State presented numerous medical experts who testified that the cause of the child's head injury was violent shaking or violent shaking combined with an impact and that the child's condition would have appeared immediately abnormal. *Id.* The State then used testimony that the child had appeared normal when she was dropped off with Edmunds to argue that the injuries had to have been caused by Edmunds. *Edmunds*, 308 Wis. 2d at 378. To support her petition for a new trial,

> Edmunds presented evidence . . . in the form of expert medical testimony, that a significant and legitimate debate in the medical community has developed in the past ten years over whether infants can be fatally injured through shaking alone, whether an infant may suffer head trauma and yet experience a significant lucid interval prior to death, and whether other causes may mimic the symptoms traditionally viewed as indicating shaken baby . . . syndrome.

*Id.* at 385-86.

The *Edmunds* court held that this constituted new evidence and warranted a new trial because there was a reasonable probability the result would be different. *Id.* at 392. In holding it constituted new evidence, the court reasoned that "it is the emergence of a legitimate and significant dispute within the medical community as to the cause of [the child's] injuries that constitutes newly discovered evidence. At trial . . . there was no such fierce debate." *Id.* And, in holding the new evidence warranted relief, the court reasoned,

> Now, a jury would be faced with competing credible medical opinions in determining whether there is a reasonable doubt as to Edmunds's guilt. Thus, we conclude that the record establishes that there is a reasonable probability that a jury, looking at both the new and the old medical testimony, would have a reasonable doubt as to Edmunds's guilt.

*Id.*

In Fero's case, this court is presented with a scenario similar to that faced by the *Edmunds* court. Fero was convicted of first degree assault of a child for recklessly injuring Brynn. 6 VRP (March 18, 2003) at 212. The evidence against Fero amounted to repeated medical opinions that Brynn's injuries must have been suffered during Fero's care because of when Brynn was unconscious and that Fero must have recklessly inflicted the injuries because of the nature of the injuries. *See, e.g.,* 1 VRP (March 12, 2003) at 63-64 (Dr. Gorecki); VRP (March 13, 2003) at 63 (Dr. Goodman); 2 VRP (March 11, 2003) at 191, 196, 202-03 (Dr. Lukschu); 1 VRP (March 12,

2003) at 84, 96-97 (Dr. Ockner); VRP (March 13, 2003) at 30 (Dr. Bennett). Now, in a petition for post-conviction relief, Fero presents medical testimony that there has been a significant *change* over the last 10 years to the medical community's understanding. Under the current generally accepted medical understanding, children can remain lucid after the injury for many hours and these injuries can be caused by something other than severe trauma.

Thus, under the logic relied upon by the *Edmunds* court, a jury in Fero's case today would be faced with medical opinions stating there is no way to determine Brynn was injured during the evening she was in Fero's care nor can it be determined what caused Brynn's injuries. *See Edmunds*, 308 Wis. 2d at 392. Therefore, there is a reasonable probability that the result of Fero's trial would be different given the new medical testimony she presents.

A Texas appellate court similarly granted a habeas corpus petitioner a new trial when she presented medical expert testimony stating that advances in science had shown that the type of injuries sustained by the child she was convicted of murdering "could have been caused by an accidental short fall onto concrete," and that there was no way to tell if the child's injuries were the result of intentional abuse. *Ex Parte Henderson*, 384 S.W.3d 833, 833-34 (Tex. App. 2012). This new testimony was contrary to the testimony presented at her trial by the medical examiner who testified it was impossible that the child's injuries could have been accidental. *Id.*

Fero cites two other cases which come to the same basic conclusions as the courts in *Edmunds* and *Ex Parte Henderson* did: *Del Prete v. Thompson*, 10 F. Supp. 3d 907 (N.D. Ill. 2014); *People v. Bailey*, 47 Misc. 3d 355, 999 N.Y.S.2d 713 (2014). These courts recognized that the medical community's new understanding of head trauma in children and the current paradigm is new evidence warranting post-conviction relief for those convicted through testimony under the

old paradigm. *Del Prete*, 10 F. Supp. 3d 907; *Bailey*, 999 N.Y.S.2d 713.  Specifically, these courts recognize that doctors now know children can remain lucid for much longer periods of time after suffering the injury and that doctors now know there are several causes for injuries once thought to be indicative only of abuse.  *Del Prete*, 10 F. Supp. 3d at 956-57; *Bailey*, 999 N.Y.S.2d at 726-727.

We hold that the medical testimony Fero presents probably would change the result at trial. Thus, Fero satisfies the first factor warranting relief under RAP 16.4(c)(3) and *In re Brown*, 143 Wn.2d at 453.

> 2. Factors 2 and 3: Discovered After the Trial and with Reasonable Diligence

Fero asserts that the evidence she presents to this court in her petition was discovered after her trial and that she was reasonably diligent in finding the evidence.  The State responds that Fero "did not exercise 'reasonable diligence' in finding this evidence or in presenting it" to this court. Br. of Resp't at 14.  We hold that the evidence Fero presents in her petition was discovered after her trial and could not have been discovered earlier with reasonable diligence.

Fero was convicted in 2003 and was incarcerated at the Washington Corrections Center for Women until her release on July 30, 2014.  She asserts, and the State does not dispute, that she has no medical training and that it was impossible for her to keep up with the developments in medical research on shaken baby syndrome.

While a few of the studies cited by Dr. Barnes and Dr. Ophoven were published before Fero's trial, the majority of the studies they cite were published after Fero was convicted and incarcerated.  Moreover, the publishing of one or more articles professing a new viewpoint or describing new evidence does not mean that the generally accepted beliefs of the medical

20

community change on, or anywhere near, the publication date—the changing of paradigms takes time. This reality is highlighted by the language of the *Edmunds* court, which, in 2008, characterized the shifting paradigm as being a "fierce debate" and a "legitimate and significant dispute within the medical community." 308 Wis. 2d at 392. Both Dr. Barnes and Dr. Ophoven stated in their declarations that the paradigm shift is a recent development and the current paradigm was not in place when Fero was tried. Therefore, we hold that the evidence was discovered after her trial. Fero thereby establishes the second factor because the current understanding of causation and duration of subsequent lucidity in pediatric head trauma was not accepted at the time of Fero's trial and was still not generally accepted at least through 2008.

We also hold that Fero exercised reasonable diligence for two reasons. First, there was not a general consensus on the new paradigm until relatively recently. Second, Fero was incarcerated during the majority of the years when the relevant medical literature and case law was being published. Expecting her to keep up with the relevant medical literature and case law while incarcerated is a high hurdle. Furthermore, once she learned of the shifting paradigm, she would still need to find an attorney who would assist her in this petition despite her indigency. Then more time would be needed for the attorney to research and draft the petition and accompanying documents. Thus, under the circumstances of this case, Fero satisfied the reasonable diligence factor.

3.    Factor 4: Materiality

Fero asserts that the evidence she presents is material. We agree and hold the testimony of Dr. Barnes and Dr. Ophoven is material. Our Supreme Court has stated that evidence is material if it is admissible and there is a "reasonable probability" that, had the evidence been presented,

"the result of the proceeding would have been different. *Rice*, 118 Wn.2d at 887; *State v. Knutson*, 121 Wn.2d 766, 772, 854 P.2d 617 (1993).

The evidence Fero presents would be admissible. The declarations of Dr. Barnes and Dr. Ophoven are sufficient to establish each as experts under ER 702, and establish their opinions as experts under ER 703. The State does not question Dr. Barnes or Dr. Ophoven as experts or question the opinions they present.

The testimony of Dr. Barnes and Dr. Ophoven is also material. As explained in the discussion on Factor 1 above, the substance of Dr. Barnes' and Dr. Ophoven's testimony creates a reasonable probability that the result of Fero's trial would be different had it been presented. Therefore, we hold that Fero established the fourth factor for warranting relief under RAP 16(c)(3) because the evidence she offered is material to her petition.

4. Factor 5: Not Merely Cumulative or Impeaching

Fero argues the evidence she presents is not merely cumulative nor impeaching. We agree and hold that the testimony of Dr. Barnes and Dr. Ophoven is not merely cumulative or impeaching.

"'Cumulative evidence is additional evidence of the same kind to the same point.'" *State v. Williams*, 96 Wn.2d 215, 223-24, 634 P.2d 868 (1981) (quoting *Roe v. Snyder*, 100 Wash. 311, 314, 170 P. 1027 (1918)). Here, Dr. Barnes' and Dr. Ophoven's testimony is not "of the same kind to the same point" as the testimony of the other doctors presented at Fero's trial. *Id.* It is, instead, evidence to the opposite point; that opposite point being that Brynn could have remained lucid for up to three days after suffering her injuries and it was impossible to determine how Brynn suffered her injuries.

Similarly, Dr. Barnes' and Dr. Ophoven's testimony is not merely impeaching. "'[I]mpeaching evidence can warrant a new trial if it devastates a witness's uncorroborated testimony establishing an element of the offense. In such cases the new evidence is not merely impeaching, but critical.'" *State v. Savaria*, 82 Wn. App. 832, 838, 919 P.2d 1263 (1996); *see also State v. Roche*, 114 Wn. App. 424, 438, 59 P.3d 682 (2002) ("Moreover, the evidence of Hoover's malfeasance is more than 'merely' impeaching; it is critical, with respect to Hoover's own credibility, the validity of his testing, and the chain of custody."). As discussed above, consistent with the generally accepted medical evidence at the time, the medical testimony at trial established that Brynn would have lost consciousness almost immediately after being injured and that her injuries could only be caused by being shaken, slamming head first into something like being in a car accident, or falling from several stories. However, the generally accepted medical paradigm now recognizes that children can remain lucid for up to three days after suffering head injuries and that those injuries are known to be caused by much less extreme circumstances. Thus, we cannot say that the new evidence is "merely impeaching."

5.     The State's Arguments are Unavailing

The State's response acknowledges that the factor test applied above is the correct standard to use. But, instead of arguing the factors, the State merely argues that (1) "[a] new medical opinion or new medical theory is not a 'material fact,'" and (2) "a new expert's opinion that the medical community would present different evidence in a trial today than it did when Fero received her trial is not 'newly discovered evidence.'" Br. of Resp't at 13. In support of its argument, the State analogizes *State v. Harper*, 64 Wn. App. 283, 823 P.2d 1137 (1992) and *State v. Evans*, 45 Wn. App. 611, 726 P.2d 1009 (1986), *review denied*, 107 Wn.2d 1029 (1987). We are not

23

persuaded because these arguments have been addressed in the factor analysis above and the conclusions in *Evans* and *Harper* are easily distinguishable.

In *Evans*, the defendant petitioned the trial court for a new trial on his arson conviction. 45 Wn. App. at 612. In support of his petition, he submitted a new expert's opinion that the fire was caused by defects in the electrical system and was, thus, an accident. *Id.* at 613. In concurring with the appellate court's holding that the defendant was not entitled to a new trial for submitting new material evidence, Judge Reed wrote:

> What we have in the instant case is, purely and simply, a question of expert witness competency. Experience has taught us that such "experts" rarely agree. What may be a crucial "fact" to one, may not be to another.
>
> Before affirming the grant of a new trial because the defense expert presented at trial overlooked or thought unimportant a fact or facts now deemed pertinent by an expert who did not testify, we must ask whether all of those defendants who could now unearth a new expert, who finds "new facts"—which if believed by the same jury might cause them to acquit—were denied a fair trial, *i.e.*, failed to receive substantial justice. Surely we have to answer in the negative, or finality goes by the boards and the system fails.

*Evans*, 45 Wn. App. at 617.

In *Harper*, 64 Wn. App. at 285, the defendant was convicted of attempted premeditated murder, and, at trial, presented a defense of diminished capacity. In support of his subsequent personal restraint petition, the defendant submitted an affidavit from a different doctor who had determined that the defendant had "depersonalization disorder" that prevented him from forming the premeditative intent to kill. *Id.* at 290-91. In reaching its conclusion, the *Harper* court relied on the same concurrence by Judge Reed in *Evans*, 45 Wn. App. at 617-18 (Reed, J., concurring). *Harper*, 64 Wn. App. at 293-94. The *Harper* court held that the new expert's opinion did not

constitute the requisite "material facts not previously presented" standard because the expert reviewed the same evidence and merely presented a new opinion. *Id.* at 294.

*Evans* and *Harper* are inapposite to Fero's case because the experts in *Evans* and in *Harper* provided second opinions based on the same trial record and under the same paradigm as existed at the time of the respective petitioners' trials. *Id.* at 293-94; *Evans*, 45 Wn. App. at 613, 617. As stated above, and restated briefly below, that is not what happened in Fero's case.

In Fero's case, Dr. Barnes and Dr. Ophoven are new experts, but their opinions establish that the scientific explanations that were offered as evidence against Fero in her trial are no longer generally accepted in the medical community. Moreover, their opinions state that based on the record that existed at Fero's trial and under the currently accepted paradigm, it is not medically possible to determine that Brynn's injuries occurred when she was with Fero, nor is it medically possible to determine how Brynn's injuries were caused. Therefore, we hold that Fero is entitled to relief from her post-conviction restraints, grant Fero's petition, and remand for a new trial.

_____
Lee, J.

We concur:

_____
Worswick, P.J.

_____
Sutton, J.