# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47572-3-II |
| Respondent, | |
| v. | |
| HECTOR FRANCISCO SAAVEDRA RUIZ, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Hector Francisco Saavedra Ruiz appeals from his second degree murder conviction, asserting that misleading expert testimony violated his due process and fair trial rights. Saavedra Ruiz also requests that we waive the imposition of appellate costs if the State prevails in this appeal. Because resolution of Saavedra Ruiz's claim requires examination of matters outside the record, we cannot address it in this direct appeal. Accordingly, we affirm Saavedra Ruiz's conviction. Because the State has stated that it will not seek costs on appeal should it prevail, we need not address Saavedra Ruiz's request to waive such costs.

## FACTS

On February 10, 2014, Kayla Des Rochers gave birth to her daughter Natalie. Saavedra Ruiz was Natalie's father. Des Rochers and Natalie lived in Olympia and would drive to Kingston about once a week to visit Saavedra Ruiz. On July 15, Des Rochers took Natalie to her doctor for a wellness exam, which showed that Natalie was healthy. On the following day, Des Rochers drove with Natalie to Kingston for their weekly visit with Saavedra Ruiz.

Saavedra Ruiz told Des Rochers that he wanted to take Natalie to the restaurant where he worked to show her off to his coworkers. Des Rochers opposed the idea because Natalie was sleeping and because Saavedra Ruiz had never been alone with the baby for a long period of time. Des Rochers ultimately allowed Saavedra Ruiz to take Natalie to his work.

Saavedra Ruiz was away with Natalie for approximately one hour. During that time, Des Rochers sent him several text messages and attempted to call him. When Saavedra-Ruiz returned to his apartment, Des Rochers saw that Natalie was not moving and did not appear to be breathing. Des Rochers tried to call 911, but Saavedra Ruiz grabbed her phone and put it in his back pocket. Someone eventually called 911.

Paramedics arrived and determined that Natalie did not have a pulse and was not breathing. After giving Natalie medication to revive her heartbeat and intubating her, paramedics transferred her to Harrison Medical Center – Silverdale. Upon arrival, Natalie's emergency room doctor believed that she was likely brain-dead. A couple hours later, Natalie was transferred to Mary Bridge Children's Hospital in Tacoma. Despite extensive efforts, Natalie died at the hospital on July 18.

On January 16, 2015, the State charged Saavedra Ruiz by first amended information with second degree murder, alleging that he caused Natalie's death in the course of committing or attempting to commit second degree child assault.[1] The State further alleged sentencing enhancements that Saavedra Ruiz committed the crime against a family member, knew the victim was particularly vulnerable, and used his position of trust to facilitate the crime.

---

[1] The State filed a second amended information on March 30, 2015, but Saavedra Ruiz was not arraigned on it.

Several medical professionals testified at trial. Pierce County Medical Examiner, Dr. Thomas Clark, testified that he had performed Natalie's autopsy. Clark stated that Natalie had a bruise on her left cheek that was likely caused by blunt force trauma. Clark also stated that Natalie had a fracture located underneath her skull bleeding within her scalp, suggesting that Natalie's scalp was impacted by "a large blunt surface with some degree of force." Report of Proceedings (RP) at 398. Additionally, Clark described injuries to Natalie's retinas, noting a strong correlation between such injuries and infants who have been shaken. Clark opined that Natalie was alive at the time her injuries were inflicted, that her symptoms would have appeared very quickly, and that her death "was a result of blunt force injury to the head." RP at 408.

Dr. John Whitt, a pediatric intensivist at Mary Bridge Children's Hospital, testified that Natalie's brain injuries were consistent with "'nonaccidental trauma,' 'child abuse,' or 'shaken baby syndrome.'" RP at 443. Whitt further testified that Natalie's head injury caused her death. Michele Breland, a pediatric nurse practitioner at Mary Bridge Children's Hospital, testified that Natalie's symptoms would have been apparent immediately after the event causing injuries to her brain. Breland stated that it would have been obvious that Natalie was not normal following a shaking event or an event causing her skull fracture.

At closing, the State referred to the above expert testimony, stating:

> We know from the testimony of Michele Breland that the injuries—the brain itself is surrounded by layers. And Ms. Breland went over what those layers were and what Natalie's injures were in this case. Now, she had an occipital skull fracture, which is a skull fracture right on the back of her head.
> In the brain there are these—what they call "bridging veins." And those veins supply blood to the brain. The brain is also made up of nerves.
> And when—when a baby is shaken, *or in Natalie's case slammed against the surface*, those nerves can be sheared. And once those nerves are broken, they can no longer communicate with the rest of the body, with the brain. They can no

3

longer tell Natalie to breathe, to swallow, to do any of the things that a normal person would be able to do. That's what occurred in this case.

RP at 566-67 (emphasis added).

The jury returned a verdict finding Saavedra Ruiz guilty of second degree murder. The jury also returned special verdicts finding that Saavedra Ruiz and Natalie were members of the same family, Saavedra Ruiz committed his crime against a particularly vulnerable victim, and Saavedra Ruiz used a position of trust to facilitate his crime. Saavedra Ruiz appeals his conviction.

## ANALYSIS

Saavedra Ruiz contends that the State violated his rights to due process and a fair trial by presenting misleading expert testimony at trial. Specifically, he contends that expert testimony regarding shaken baby syndrome was misleading because it was based on outdated science. But Saavedra Ruiz does not identify anything within the record showing that this expert testimony was misleading or based on outdated science. Instead, Saavedra Ruiz relies on our decision in *In re Pers. Restraint of Fero*, 192 Wn. App. 138, 367 P.3d 588 (2016), to argue that he is entitled to a new trial based on the allegedly misleading testimony. Saavedra Ruiz's reliance on *Fero* is misplaced.

In *Fero*, we granted postconviction relief from the petitioner's first degree child assault conviction based on the petitioner's submitted declarations from medical experts regarding a "paradigm shift in the medical community's understanding of head trauma in children." 192 Wn. App. at 149. For example, a declaration from pediatric neuroradiologist Dr. Patrick Barnes stated:

No. 47572-3-II

> Given the new medical research on lucid intervals, the testimony of the State's experts to the effect that [the victim] would have immediately gone unconscious is unsupported by the medical literature. It is impossible to tell from the radiology or otherwise in the medical record when [the victim] was injured, and there is a significant chance that she was injured before she arrived at Ms. Fero's home.

*Fero*, 192 Wn. App. at 150. Dr. Barnes concluded that "'[a]t the time of Ms. Fero's trial, many doctors would have agreed with the doctors for the state . . . . However, shaken baby syndrome theories as applied in this case are no longer supported by the scientific literature.'" *Fero*, 192 Wn. App. at 150 (alteration in original). Similarly, a declaration from pediatric forensic pathologist Dr. Janice Ophoven concluded:

> Based on the medical records, my review of the literature, and my experience as a pediatric forensic pathologist . . . it is my opinion that much of the medical testimony presented during Ms. Fero's 2003 trial is no longer scientifically valid in light of recent advances in the medical community's understanding of the natural, accidental and non-accidental causes of cerebral edema, subdural hematoma and retinal hemorrhages.

*Fero*, 192 Wn. App. at 151.

We held that these declarations constituted newly discovered evidence that would have likely changed the results of the petitioner's trial and, thus, granted the petition and remanded for a new trial. *Fero*, 192 Wn. App. at 154-61, 165.

Because the petitioner in *Fero* was collaterally attacking her conviction, she was permitted to rely on submitted declarations that were not part of the trial record to support her claim. *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995) (A personal restraint petition is the appropriate means of having reviewing court consider matters outside the trial record.). In contrast with *Fero*, Saavedra Ruiz must rely solely on the trial record to support his claims on direct appeal. *McFarland*, 127 Wn.2d 338. Because nothing in the trial record

5

demonstrates that the State presented misleading expert testimony at trial, Saavedra-Ruiz's due process and fair trial claims cannot succeed.

Moreover, even if Saavedra Ruiz could rely on the same outside-the-record evidence cited in *Fero* showing that previous theories regarding shaken baby syndrome have been undermined by new scientific research, it would not likely assist in his claims. Although the expert medical testimony presented in Saavedra Ruiz's trial linked symptoms of Natalie's brain injuries with shaken baby syndrome, it is clear from the record that the State did not allege that a shaking event caused her death.

Unlike the victim in *Fero*, Natalie suffered a skull fracture. Here, Dr. Clark testified that Natalie's death was caused by blunt force trauma to the back of her head. Dr. Whitt was less specific as to Natalie's cause of death, stating only that her head injury caused her death. And, although Dr. Whitt linked her symptoms with "shaken baby syndrome," he used the term interchangeably with "nonaccidental trauma," and "child abuse." RP at 443. Whitt did not testify that in his opinion Natalie died as a result of shaken baby syndrome. Finally, Breland testified that Natalie's injuries could have been caused by a shaking event or by the event causing her skull fracture, but the State was clear during closing arguments that it was not relying on an inference that Saavedra Ruiz caused her death by shaking her. At closing, the State argued:

> And when—when a baby is shaken, *or in Natalie's case slammed against the surface*, those nerves can be sheared. And once those nerves are broken, they can no longer communicate with the rest of the body, with the brain. They can no longer tell Natalie to breathe, to swallow, to do any of the things that a normal person would be able to do. That's what occurred in this case.

No. 47572-3-II

RP at 567 (emphasis added). Because it is clear that nothing in the trial record supports Saavedra Ruiz's claim that the State relied on outdated and misleading expert testimony, we do not speculate as to how extra-record evidence would support Saavedra Ruiz's claim.

The State did not violate Saavedra Ruiz's due process or fair trial rights. Accordingly, we affirm his conviction.

Saavedra Ruiz requests that we waive the imposition of appellate costs due to his inability to pay such costs. Because the State has indicated that it will not seeks appellate costs in this matter, we need not address Saavedra Ruiz's waiver request.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Maxa, A.C.J.

Sutton, J.