IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) ) ) | No. 34165-8-III |
| JOSE LEONEL MONCADA, | ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) ) | |

PER CURIAM — Jose Leonel Moncada was convicted by a Yakima County jury in

2011 of first degree rape of a child and attempted first degree child molestation. On

appeal, we remanded to correct errors in the judgment and sentence. *See State v.*

*Moncada*, No. 30222-9-III (Wash. Ct. App. June 17, 2014) (unpublished),

http://www.courts.wa.gov/opinions/pdf/302229.pdf.), *review denied*, 181 Wn.2d 1031

(2015). In this timely personal restraint petition, Mr. Moncada now contends (1) he has

discovered new evidence that would probably change the verdict, and (2) he had

ineffective assistance of appellate counsel, who failed to argue that (a) he was entitled to

a unanimity instruction, (b) the trial court's aggravating factor instruction constituted an

unconstitutional comment on the evidence, and (c) the law did not support imposition of

the exceptional sentence. We find no merit and dismiss.

FACTS

In the summer of 2009, 39-year-old Jose Moncada lived in Yakima with his girlfriend, R.Q., and her 11-year-old daughter, A.C. For years, A.C. had mistakenly believed Mr. Moncada was her father, until her mother revealed earlier that year that he was not. In April 2010, A.C. told family members and the police that Mr. Moncada had begun touching her inappropriately during the previous year. She related the following incidents: (1) One night in August 2009, A.C. crawled into her mother's bed to watch a movie. She fell asleep, but awoke later with Mr. Moncada's erect penis against her thigh and his fingers inside her vagina. She removed herself from the bed by telling him she had to go to the bathroom; (2) Several months later, in February 2010, A.C. asked Mr. Moncada to massage her injured back. During the massage, he slid his hand inside her underpants and massaged her buttocks; (3) In March 2010, Mr. Moncada entered A.C.'s room three times, kissed A.C. on her lips and neck, and patted her buttocks. Soon after these events, A.C. began cutting herself.

The State charged Mr. Moncada with first degree rape of a child and two counts of attempted child molestation in the first degree, all occurring between separate date ranges. At trial, the State presented evidence from investigating officers, A.C., her mother, her aunt Maria Piña, her brother, and chaplain Sister Fe Sumalde. Detective Mark Andrews testified that Mr. Moncada stated that he could not remember sexually touching A.C. in August 2009, but that he could have confused her with his wife while he

2

was asleep. A.C. described the three periods of incidents and explained that she finally told her aunt because she was afraid of being left alone with Mr. Moncada during spring break in April 2010. She denied telling anyone that Mr. Moncada had inserted his penis in her. Ms. Piña described how agitated A.C. was when describing the abuse, and A.C.'s brother stated that, shortly before she reported the incidents, A.C. had said she did not want to be alone with Mr. Moncada. Sister Sumalde, who talked to A.C. at the hospital, testified that A.C. was very upset and said that Mr. Moncada sexually abused her.

Defense counsel cross-examined A.C. and the other witnesses to show that A.C.'s reports of abuse were sometimes inconsistent. Defense counsel also presented the testimony of a hostile witness, neighbor Judith Garcia, who stated that A.C. had recently claimed for the first time that Mr. Moncada penetrated her vagina three times with his penis. Mr. Moncada testified on his own behalf that he would never touch A.C. inappropriately. He explained that he only massaged her back when she asked him to do so, and that A.C.'s mother was always present. He also suggested that A.C. made up the incidents because she was angry that he had lied about being her father, and to avoid punishment for stealing money from Mr. Moncada's mother.

The jury found Mr. Moncada guilty of counts 1 and 3 and not guilty of count 2. For both counts 1 and 3, the jury found the aggravating circumstance that he used his position of trust or confidence to facilitate the commission of the crimes. The trial court imposed an upward exceptional sentence.

NEWLY DISCOVERED EVIDENCE

In preparation for filing this personal restraint petition, Mr. Moncada gave his investigator names of people who eventually led to the discovery of two witnesses who claimed that A.C. told them stories inconsistent with her statements to police and the testimony at trial. He contends the declarations of these two witnesses are newly discovered evidence that requires a new trial.

To prevail in this personal restraint petition, Mr. Moncada must show that he was actually and substantially prejudiced either by an error of constitutional magnitude or by a fundamental nonconstitutional error that caused a complete miscarriage of justice. *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013); *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 884-85, 952 P.2d 116 (1998). He may not rely on conclusory allegations, but must show with a preponderance of competent, admissible evidence that the error caused him prejudice. *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 636, 362 P.3d 758 (2015). Mr. Moncada's claim of newly discovered evidence is nonconstitutional.

"Newly discovered evidence" may justify relief in a personal restraint petition if the new facts "in the interest of justice require vacation of the conviction, sentence, or other order entered in a criminal proceeding." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 319, 868 P.2d 835 (1994) (quoting RAP 16.4(c)(3)). The standard applied is the same as that applied to a motion for a new trial, which requires the defendant to show

4

"'that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching.'" *Id.* at 319-20 (quoting *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)).

The evidence here consists of two declarations signed in February 2016 (after Mr. Moncada's appeal and resentencing): one by a childhood friend of A.C.'s cousin, Briseyda Pulido, and one by a young adult friend of A.C.'s family, Joanna Monteiro. Ms. Pulido, states that her family lived with A.C.'s aunt Piña in Yakima for about six months, presumably in early 2010, and that she played with A.C. several times a week during that time. One evening, A.C. and her brother were moved into her aunt's house. Ms. Pulido overheard the adults say that Mr. Moncada had "sexually abused" A.C. Am. Br. in Support of Am. Pers. Restraint Pet., App. A., Decl. of Briseyda Pulido, at 1. Ms. Pulido then relates statements A.C. made during and after the time she was living in her aunt's house:

> 6. One day while [A.C.] was staying at our house, she and I were jumping on the trampoline in the backyard. Her face was all splotchy. I asked why she was crying, but she acted like nothing had happened and kept on jumping. When we were both tired out from jumping, we sat down. I asked her again why she was crying. She told me it was because none of it was true. [A.C.] said nothing had happened with [Mr. Moncada].
> 7. A few weeks later, after [A.C.] and her brother moved back home, we had a girls' night sleep over at [A.C.'s] house. . . .
> 8. That night, . . . I was curious, because of what [A.C.] told me by the trampoline and the way the adults were talking that night. I asked [A.C.] if what she told me on the trampoline was a lie. [A.C.] seemed

anxious, but said she was telling the truth on the trampoline. [A.C.] also told me that her aunt Maria was pushing her to say she had been raped. [A.C.] told me she was not raped.

9. For some years, no one mentioned to me again the accusations that [Mr. Moncada] had abused [A.C.]. But then in late 2014 or early 2015, I heard that [Mr. Moncada] was in jail for raping [A.C.]. Learning that information made me think immediately of my conversations with [A.C.]— that she told me it wasn't true. I told my mother about those conversations.

10. I had not told anyone else about my conversations with [A.C.] in Yakima. No one had ever asked me about it. . . .

*Id.* at 1-3.

The second declaration is by Ms. Monteiro, a teenage friend of A.C. and her mother and an occasional worker at Mr. Moncada's restaurant. After Mr. Moncada's arrest, A.C.'s mother asked Ms. Monteiro, who had also suffered abuse, to talk to A.C. about what had happened. Ms. Monteiro later asked A.C. if she wanted to talk, and they had the following exchange:

5. [A.C.] told me she came downstairs and got in bed between her parents, which she did sometimes. This happened shortly after she learned [Mr. Moncada] was not her real father during a family argument. As she was trying to fall asleep, she felt [Mr. Moncada's] hand go down her pants. She said "stop" or she moved, and he pulled his hand out of her pants.

6. I asked [A.C.] if he did anything else, did he go any further. She said no, that was all that happened.

7. [A.C.] never said [Mr. Moncada] put his fingers inside of her. She never mentioned fingers at all, or any actual molestation.

8. I asked [A.C.] if he had ever done anything else, and she said no, that was the only time.

9. I told [A.C.'s mother] later, based off what [A.C.] told me, that [Mr. Moncada] molested her.

10. I never saw any police reports. I was never interviewed as a possible witness. I didn't personally follow the trial. But later, I was very

> surprised to learn the length of the sentence [Mr. Moncada] got, based on
> what [A.C.] told me had happened.

*Id.*, App. B, Decl. of Joanna Monteiro at 1-2.

The State concedes that the evidence from these two witnesses is new and could not have been discovered before trial with the exercise of due diligence. We agree. Ms. Pulido was younger than A.C., had limited contact with A.C. except for the brief time they lived in the same house, and told only her mother about talking with A.C. Ms. Monteiro had been a teenager at the time of her conversation with A.C. and simply confirmed to A.C.'s mother that Mr. Moncada had molested A.C. Neither the State nor defense counsel learned of these witnesses and had no reason to suspect that they had additional information.[1]

We, therefore, confine our analysis to whether the new witnesses' testimony is material, not merely cumulative or impeaching, and would probably change the verdict. To aid us in this determination, we remanded for the superior court to conduct a reference hearing in accordance with RAP 16.12. Ms. Monteiro testified at the hearing in line with her prior declaration. Reference Hr'g Findings of Fact, *In re Pers. Restraint of Moncada*,

---

[1] In an alternative argument, Mr. Moncada contends that if this court finds that the declarations could have been discovered before trial with due diligence, then trial counsel was ineffective in failing to properly investigate. We need not address this claim because we find that the evidence would not have been discovered before trial, even with a reasonably thorough investigation. In light of this decision, we deny the State's August 2019 motions to strike various declarations and arguments related to the claims of ineffective assistance of trial counsel.

No. 10-1-00543-4, at 2-3 (Yakima County Super. Ct., Wash. Nov. 18. 2019). A.C., however, testified that she had no recollection of having ever discussed her abuse with Ms. Monteiro. *Id*. at 4 (Finding of Fact (FF) 12). After weighing the evidence, the court concluded "the testimony of Joanna Monteiro does not render the testimony of [A.C.] unbelievable." *Id*. at 5 (Conclusion of Law (CL) 1).

Despite several attempts at contacting Ms. Pulido, including rescheduling the reference hearing, Mr. Moncada was unable to obtain Ms. Pulido's testimony either in person or by telephone. *Id*. at 3-4 (FF 9). Testimony provided by Mr. Moncada's defense investigator showed that Ms. Pulido was intentionally avoiding the proceedings. A.C. testified that she had no recollection of discussing the abuse with Ms. Pulido. *Id.* at 4 (FF 17). A.C. also clarified that Ms. Pulido had never actually been a friend, but had been a friend of A.C.'s younger cousin. *Id*. (FF 16). Because of Ms. Pulido's absence, the court did not consider Ms. Pulido's declaration and made no findings or conclusions as to her credibility or whether her testimony would have affected the verdict. *Id*. at 5 (CL 2).

Mr. Moncada contends the evidence is material and probably would change the result of the trial because the State's case rested entirely on A.C.'s uncorroborated testimony. Citing *State v. Savaria*, 82 Wn. App. 832, 919 P.2d 1263 (1996), *overruled on other grounds by State v. C.G.*, 150 Wn.2d 604, 80 P.3d 594 (2003), he argues that

Ms. Monteiro's and Ms. Pulido's declarations are more than merely impeaching because they devastate A.C.'s trial testimony.

The defendant in *Savaria* was convicted of felony harassment and intimidating a witness, based on the testimony of his girlfriend that he called and threatened to kill her. The girlfriend stated that she called and told her father about the threat; her father corroborated this testimony. Defense counsel moved for a new trial based on newly discovered evidence of telephone records that proved the girlfriend had not called her father as they both had testified. On appeal, Division One of this court held that the telephone records likely would have affected the verdict and were not merely impeaching, but critical. In reaching this holding, Division One found it persuasive that other jurisdictions "have held that impeaching evidence can warrant a new trial if it devastates a witness's uncorroborated testimony establishing an element of the offense":

> In this case the evidence of the threat, which formed the basis for at least the harassment charge, came solely from [the girlfriend's] testimony and was denied by the defendant. In addition, the claimed phone call was used by [the girlfriend] to establish her fear, which is also an element of harassment. Her credibility was crucial.

*Savaria*, 82 Wn. App. at 838 (footnote omitted). The *Savaria* standard for newly discovered evidence was similarly used in *In re Personal Restraint of Fero*, 192 Wn. App. 138, 157, 163, 367 P.3d 588 (2016), *rev'd*, 190 Wn.2d 1, 409 P.3d 214 (2018), which remanded for a new trial due to new medical evidence that undermined "shaken baby syndrome" evidence relied on at trial. In a plurality decision, the Washington

Supreme Court reversed and dismissed the petition because the evidence was insufficient to probably change the result at trial. *Fero*, 190 Wn.2d at 23.

Traditionally, Washington courts have been reluctant to grant new trials based on newly discovered evidence that is merely cumulative or impeaching. Cumulative evidence "'is additional evidence of the same kind to the same point.'" *Williams*, 96 Wn.2d at 223-24 (quoting *Roe v. Snyder*, 100 Wash. 311, 314, 170 P. 1027 (1918)). As noted in *Williams*, "Hardly a case can be supposed but what, by diligent search, some additional evidence will be found that would, if offered at trial, have been admissible on one theory or another. The mere existence of such evidence does not alone justify the granting of a new trial." *Id.* at 224.

If offered at trial, the statements relayed in Ms. Pulido's declaration[2] (assuming her presence could be procured) could have been used to impeach A.C.'s credibility. *See* ER 613 (use of prior inconsistent statements for impeachment in court); *State v. Johnson*, 40 Wn. App. 371, 377, 699 P.2d 221 (1985). The same is true of Ms. Monteiro's testimony.[3] Although these witnesses could have potentially provided impeaching

---

[2] Although the superior court refused to consider Ms. Pulido's declaration in the absence of her presence, we still review the allegations presented in the declaration and the likely effect they would have had on the jury.

[3] Although partially inconsistent with A.C.'s testimony, Ms. Monteiro's testimony also corroborates A.C.'s statement that Mr. Moncada put his hand in her pants while she was sleeping next to him. Thus, Ms. Monteiro's testimony does not clearly weigh in favor of one side or another.

10

testimony, we must acknowledge these witnesses are ultimately cumulative. At trial, Mr. Moncada attempted to impeach A.C. with prior inconsistent statements through Judith Garcia's testimony. The new accounts provided by Ms. Pulido and Ms. Monteiro are, therefore, cumulative because they are additional evidence on the same point. *Id.* at 223-24.

And unlike the phone records in *Savaria*, the new declarations and testimony are not conclusive proof that A.C. lied. It is just as likely that A.C. was reluctant to share such private information with family friends who were not her close personal confidants. With respect to Ms. Pulido, it is completely plausible that A.C., who was two years older than Ms. Pulido and not close friends with her, would have denied the allegations to Ms. Pulido. Neither of them were even teenagers, and at that young age, two years is a significant age gap—taking Ms. Pulido out of A.C.'s peer group and in a position to not want to address the matter with a younger person. The significant age gap between A.C. and Ms. Monteiro, and the fact that Ms. Monteiro was not an adult or close trusted friend, could similarly explain why A.C. would only want to partially, and not fully, discuss the matter with Ms. Monteiro.

On balance, this new evidence is insufficient to "probably" change the result of the trial. *Lord*, 123 Wn.2d at 319-20 (quoting *Williams*, 96 Wn.2d at 223). Far from "devastating" A.C.'s testimony, the new evidence is merely cumulative of defense attempts to impeach her. It is conceivable that these additional witnesses might *possibly*

11

change the jury's verdict. But, "strengthening the defense's trial theory is not the standard for newly discovered evidence." *Fero*, 190 Wn.2d at 18. Mr. Moncada thus fails to show that the newly discovered evidence "in the interest of justice" requires vacation of his sentence. RAP 16.4(c)(3).

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Mr. Moncada claims he received ineffective assistance of appellate counsel, citing counsel's failure to argue that (1) he was entitled to a unanimity instruction on count 3, (2) the trial court improperly commented on the evidence in its aggravating factor instruction, and (3) the evidence did not support the aggravating factor.

A defendant has a constitutional right to effective assistance of counsel. *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Because Mr. Moncada has not had an opportunity for judicial review of the effectiveness of his counsel, he need only show that he is unlawfully restrained. RAP 16.4; *State v. Sandoval*, 171 Wn.2d 163, 168, 249 P.3d 1015 (2011) (petitioner is not required to show actual and substantial prejudice for constitutional error when he or she has not had a prior opportunity to appeal the issue to a disinterested judge); *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 214, 227 P.3d 285 (2010). He must, however, show the prejudice required for a claim of ineffective assistance of counsel. *Sandoval*, 171 Wn.2d at 168.

To prevail on a claim of ineffective assistance, Mr. Moncada must show that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance actually prejudiced him. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 166, 288 P.3d 1140 (2012). This court strongly presumes that appellate counsel's decisions constituted sound strategy. *Elmore*, 162 Wn.2d at 252. "Failure to raise all possible nonfrivolous issues on appeal is not ineffective assistance of counsel, however. Rather, the exercise of independent judgment in deciding which issues may be the basis of a successful appeal is at the heart of the attorney's role in our legal process." *Lord*, 123 Wn.2d at 314. Consequently, to prevail on his claim of ineffective assistance of appellate counsel, Mr. Moncada must show that the legal issues his counsel failed to raise on appeal had merit and that he was actually prejudiced by the failure to raise those issues. *Id*. He fails to make this showing here.

*Unanimity Instruction*. When several distinct criminal acts are alleged against a defendant but only one count of criminal conduct is charged, the jury must unanimously decide which act constitutes the crime. *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 406 n.1, 756 P.2d 105 (1988), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). In a typical *Petrich* instruction, the jury is directed that all 12 jurors must agree that the same criminal act has been proved beyond a reasonable doubt. *Id*. This rule only applies, however, when the State presents

evidence of more than one distinct act. *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989). Unanimity is not required when the evidence indicates a continuing course of conduct. *Id.*; *State v. McNearney*, 193 Wn. App. 136, 141, 373 P.3d 265 (2016). In determining whether criminal acts constitute a continuing course of conduct, we evaluate the facts in a commonsense manner and ask whether the acts are intended to reach the same objective. *Handran*, 113 Wn.2d at 17; *McNearney*, 193 Wn. App. at 141.

The evidence here indicates a continuing course of conduct: A.C. recounted three incidents of unwanted physical contact by Mr. Moncada during a single March 2010 night. Although she reported that Mr. Moncada left the room between each contact, he returned repeatedly within a short period of time. These acts were committed each time on the same victim and evidenced the same objective, interpreted by the victim as sexual contact. Due to the systematic pattern of these contacts, a *Petrich* instruction was unnecessary. Consequently, appellate counsel did not provide deficient performance.

*Comment on the Evidence*. Mr. Moncada next argues that appellate counsel should have objected to instruction 20 (11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 300.23, at 803 (4th ed. 2016) (WPIC)), which defined the "abuse of trust" aggravating factor found by the jury. He contends the language of the instruction appears to contain the court's opinion of the sufficiency of the evidence to support his guilt on the underlying crimes.

14

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. A definitional instruction that effectively resolves a contested issue of fact unconstitutionally comments on the evidence because it relieves the State of its burden to establish an element of the crime. *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015). "A jury instruction that does no more than accurately state the law pertaining to an issue, however, does not constitute an impermissible comment on the evidence by the trial judge." *State v. Woods*, 143 Wn.2d 561, 591, 23 P.3d 1046 (2001) (quoted in *Brush*, 183 Wn.2d at 557).

Here, instruction 20 must be considered in context with the other jury instructions related to the special verdict. *See State v. Henderson*, 192 Wn.2d 508, 512, 430 P.3d 637 (2018). In instruction 17 (WPIC 160), the trial court informed the jurors that they would be given three special verdict forms, and that if they found the defendant not guilty on any count, they were not to use the special verdict form for that count. Instruction 18 (WPIC 300.02) reiterated this point:

> If you find the defendant guilty of the crime of First Degree Rape of a Child as charged in Count 1 or if you find the defendant guilty of the crime of Attempted First Degree Child Molestation in Counts 2 or 3, then you must determine if the following aggravated circumstance exists as to that count:
> Whether the defendant used his position of trust or confidence to facilitate the commission of the crime.

15

Clerk's Papers (CP) (No. 30222-9-III) at 50. The jury found Mr. Moncada guilty of counts 1 and 3, and further found by special verdict that he used his position of trust or confidence to facilitate those crimes.

Mr. Moncada contends instruction 20 unconstitutionally commented on the evidence because it presumed a "crime" was committed on a "victim," facts he challenged at trial. However, as pattern instructions 17 and 18 indicate, the jury was admonished *not to* consider the aggravating circumstance or use the special verdict form unless it found Mr. Moncada guilty of a particular count. In the context of the instructions as a whole, instruction 20 accurately stated the law and did not comment on the evidence.[4] Consequently, Mr. Moncada's issue has no merit that would justify appellate review. Appellate counsel did not provide deficient performance by not challenging the instruction.

*Evidence to Support the Aggravating Factor.* Mr. Moncada also claims that appellate counsel should have challenged the legal applicability of the abuse of trust aggravator as not being "substantial and compelling" in this case. He argues that every instance of a child abused by someone she knows involves an abuse of trust, and that

---

[4] Even if Mr. Moncada could demonstrate deficient performance, he cannot demonstrate prejudice because the jury's acquittal on count 2 shows that instruction 20 did not mislead the jurors into believing that the court had already found Mr. Moncada guilty.

16

nothing about this case sets it apart from the typical abuse case. Thus, he concludes that abuse of trust is already factored into the standard range.

This argument is patently frivolous as it ignores the fact that the crimes of rape of a child and child molestation do not require proof that the defendant held a position of trust with the victim or that the defendant even knew the victim. The argument also ignores the fact that these same crimes are also often committed by complete strangers. Our reporter volumes, and even the nightly news, contain an untold number of rape cases following acts of kidnapping and child luring committed by complete strangers, as well as shockingly regular instances of child abuse committed against children who are trafficked and forced into prostitution. These other situations may also satisfy other statutory aggravators enacted by the legislature. Thus, it might be that the legislature has in fact created so many aggravators that the aggravators are the proverbial "exception that swallows the rule," but the wisdom of that policy is not ours to override. *Shelton Hotel Co. v. Bates*, 4 Wn.2d 498, 508, 104 P.2d 478 (1940); *Millay v. Cam*, 135 Wn.2d 193, 203, 955 P.2d 791 (1998); *State v. Jackson*, 137 Wn.2d 712, 725, 976 P.2d 1229 (1999) ("This court should resist the temptation to rewrite an unambiguous statute to suit our notions of what is good public policy."). Accordingly, appellate counsel was not deficient in failing to raise this argument.

No. 34165-8-III
*In re Pers. Restraint of Moncada*

## CONCLUSION

The newly discovered evidence offered by Mr. Moncada does not justify relief because the information is cumulative, merely impeaching, and has not been shown to be of such strength that it would have probably changed the verdict. Mr. Moncada also fails to show that his appellate counsel's performance was deficient or prejudiced his appeal. Accordingly, we dismiss his petition. We also deny the State's remaining motions to strike declarations and arguments related to the claims of ineffective assistance of counsel.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

For the Court:

*Result only —*

_____
Korsmo, A.C.J.

_____
Fearing, J.

_____
Lawrence-Berrey, J.

18